SMITH *v.* THE STATE OF MARYLAND, AT THE INSTANCE AND FOR THE USE OF CAR-ROLL AND MACCUBBIN.

A writ of error lies to the highest court of a state, in a case where the question is whether a confiscation under the law of the state was complete before the treaty of peace with Great Britain. By the confiscating acts of Maryland the equitable interests of British subjects were confiscated, without office found, or entry or other act done, and although such equitable interests were not discovered until long after the peace.

ERROR to the court of appeals of the state of Maryland, being the highest court of law and equity in that state; and which affirmed the decree of the chancellor of Maryland.

The facts of the case appear to be correctly stated in the decree of the chancellor, which was as follows:

" The material facts appearing in this case are, that on the 4th of July, 1774, the lands mentioned in the bill were conveyed by Anne Ottey, *heir at law* of William Ottey, to William Smith, one of the defendants, and that an act of assembly. passed in June, 1779, for recording the deed of conveyance which had not been recorded within the time limited by law. That on the 5th of July, 1774, Smith executed a bond of conveyance to Anne Ottey, *widow* of William Ottey, and that at the time of passing the act of October, 1780, c. 45. ' to seize, confiscate and appropriate all British property within this state,' he held the said lands under the said deed, subject to the terms of the said bond of conveyance, and in trust for the said Anne Ottey, then and now a British subject, and that the lands are now held in the same manner. That on the 27th of April, 1801, the complainants, Carroll and Maccubbin, gave information of this property being so held, to the state's agent, and claimed the composition held out by law on the said information. That on the 22d of February, 1803, the governor and council agreed to sell the state's right to the said lands to the said Carroll and Maccubbin. That a survey was made and a plat returned and bond given for the purchase-money on the 30th of April, 1803.

" The object of the bill is to compel the defendant Smith to produce in this court all deeds, papers and writings respecting the said land, and to convey the

same to the said Carroll and Maccubbin, and for general relief, &c.

" The positions relied on by the complainants in their notes are, that the property so held in trust for a British subject; or in which a British subject had an equitable interest, but no legal estate, was liable to confiscation under the laws of this state, and was confiscated by them; and that there is nothing in any treaty between the United States and Great Britain, to protect the said property, or to prevent its being liable to their claim.

" For the defendants it is contended that the 6th article of the treaty of the 3d of September, 1783, declaring that there should be no future confiscations made, had the effect of preventing any transfer, by the executive, of property which might have been confiscated; but was only *legally*, and not *actually* transferred from private to public use, or from the possessor to the state ; and that such transfer by the executive must be considered as a *future* confiscation, or setting apart for the public, property the use of which an individual had, and therefore contrary to the stipulations of the treaty. And it is also contended that under the 9th article of the British treaty of the 19th of November, 1794, (by which it was agreed that the British subjects who then held lands in the territories of the United States should continue to hold them according to the nature and tenor of their respective estates and titles therein,) this property is protected, being then held by the defendant Smith, as agent of and for Anne Ottey, a British subject, and therefore then held by her.

" In a case of this nature where an important question as to the operation of a treaty arises, it would be satisfactory to the chancellor to have the opinion of a court of law, or its judges. The late change in the judiciary has however rendered the obtaining such an opinion less practicable than it formerly was; and it appears also that the most material ground taken by the defendants has been already decided on by the general court in the case of *Norwood's Lessee* v. *Owings*.

"A number of points were decided in that case, but the one most applicable to the present question was the determination by the court, or the opinion expressed, that the state of Maryland by their commissioners was in possession of all British property within the limits of the state, under and by virtue of the act of confiscation, *October*, 1780, *c.* 45. and the act of the same session *c.* 49. to appoint commissioners, &c. : and the possession of the said land was in the state of Maryland at the time the said Edward Norwood obtained his escheat warrant, and that no British subject could hold land in the state of Maryland on the 19th of November, 1794, the time when the treaty was entered into between Great Britain and the United States.

" It is not necessary at this time to declare any opinion as to the intent and meaning of the 9th article of that treaty, or to ascertain to what part of the territories of the United States it might have applied. It is sufficient to observe that according to the opinion of the general court, standing as yet unreversed, it could not apply to this state.

" There is nothing in this case to induce the chancellor to determine contrary to that opinion; and if the holding of the land by Smith for Anne Ottey was a holding by her in October, 1780, and occasioned its confiscation, it cannot be considered that she held the land in November, 1794, so as to be enabled, by the 9th article of the treaty with Great Britain then made, to continue to hold it according to the nature and tenor of her estate.

" The words of the 2d section of the act of *October*, 1780, *c.* 45. are, 'That all property within this state, (debts only excepted,) belonging to British subjects shall be seized, and is hereby confiscated to the use of this state,' and under this general expression, it is considered that land in which the legal title was held by a citizen of this state in trust for a British subject, (as is the case now in question,) was included.

6

" That this was the construction given to the act appears from the subsequent conduct of the legislature and the executive of this state, and particularly by the first section of the act of 1784, c. 81. which directs, that the intendant of the revenue be authorized and required to call on all persons having confiscated British property in their possession, or the title papers thereof, or relating thereto, to discover and deliver up the same; and if the said intendant has probable and good ground to suspect that any person holds the same in trust for any British subject, or conceals the same, or any deeds, writings or evidence of the titles to such property, he may and shall direct the attorney-general to file a bill in the high court of chancery, on behalf of this state, for the discovery of such trust or concealed property, and for delivering up such deeds, writings, and evidence of title, to the same; thereupon proceedings shall be had, and decree made, according to the rules of the high court of chancery in such cases.

" And it will be observed that, by the fifth article of the treaty of 1783, the recommendation to be made for a restitution of property confiscated, extends to all estates, rights and properties.

" If, then, this property was confiscated, and the right to it vested in the state by the acts of *October*, 1780, c. 45. and c. 49. the chancellor does not perceive how it can be affected by the sixth article of the treaty of 1783, declaring that there should be no future confiscations made.

" The future acts of confiscation to be restrained by that article were absolute confiscations, and not the dispositions that might be necessary for those which had been made.

" Such dispositions might have been the subject of consideration, if the recommendations made for a restitution of property confiscated, had been complied with by this state.

" Considering, then, the lands in question to have been

confiscated, and that the right of the state, or those claiming under the state, is not affected by either of the treaties which have been relied on, it remains only to inquire as to the grounds of the complainants' application to this court, and the nature of the relief to which they may be entitled.

" The act of 1802, c. 100. under which the complainants allege that the purchase was made, declares, that it shall and may be lawful for any person or persons purchasing as aforesaid any confiscated British property under the authority of this act, to prosecute any suit or suits, either in law or equity, in the name of the state, for recovery of said property for their use.

" If this property had not been sold, it might have been competent for the state to have proceeded by suit to devest the legal estate from the defendant William Smith; and it seems consonant to equity, and to the provisions of the act just mentioned, that in the present case it should be vested in the complainants, who were the purchasers from the state."

Then follows the formal part of the decree, that Smith should convey the land to Carroll and Maccubbin. From this decree Smith appealed to the court of appeals of Maryland, who confirmed the decree; whereupon he brought his writ of error to this court, under the provisions of the 25th section of the *judiciary act of* 1789, *Laws U. S. vol.* 1. *p.* 63. the decision being against the right claimed under the treaty.

*Johnson*, for the plaintiff in error.

The question in the case is, whether a British subject who *in fact* by her agent and trustee, *held* land in Maryland, before the revolution, and continued to hold it undisturbed until the year 1802, is protected by the treaties; or whether our acts of confiscation were so operative as to enable an *informer*, in a court of *equity*, to compel the trustee to convey the legal estate to him.

This depends upon the true construction of the acts SMITH<br>
of assembly of Maryland, and of the treaties with <span>v.</span><br>
Great Britain. MARYLAND.

It is for this court to decide whether the construction which the Maryland courts have given to their acts of assembly, be consistent with the true construction of those treaties.

The 5th and 6th articles of the treaty of peace of the 3d of September, 1783, (*Laws U. S. vol. 1. p. 482.*) relate to this subject, and are both to be taken into view in order to ascertain what the 6th article means when it says, " *there shall be no future confiscations made.*"

By the 5th article it is agreed that congress shall earnestly recommend the restitution of confiscated property belonging to real British subjects, and also of persons resident in districts in the possession of his majesty's arms, who had not borne arms against the United States. This was contemplated to be done without payment therefor. But as to the refugees who had borne arms against the United States, congress was to recommend restitution only upon the terms of payment (to any person who might then be in possession) of the price which had been paid for the purchase thereof since confiscation. But if the property had not been sold, *even they* were not to pay for their estates, although the state might have discovered, seized and possessed them. This was the spirit of reconciliation which was entertained between the parties at that time, and ought not to be forgotten in construing the treaty. These, however, were cases where the state had actually possessed themselves of the property, and had used or disposed of it. In those cases the interposition of the state was necessary to give effect to the intention of that part of the treaty. The 5th section, therefore, relates entirely to confiscations actually made and finished, and where the state sovereignties had possessed, and used, or disposed of the property. But the cases of inchoate confiscation, where the possession had not been devested, where the party still enjoyed the property, but where the states would, under the

SMITH
v.
MARYLAND.

existing laws, have a right to seize and possess them-
selves of the property, and where some act still re-
mained to be performed in order to completely
vest the title and possession in the state, such cases
were reserved for the subject of the 6th article; which
stipulates "that there shall be no future confiscations
made; nor any prosecutions commenced against any
person or persons for or by reason of the part which
he or they may have taken in the present war; and
that no person shall on that account suffer any fu-
ture loss or damage, either in his person, liberty, or
property; and that those who may be in confinement
on such charges at the time of the ratification of the
treaty in America, shall be immediately set at liberty,
and the prosecutions so commenced be discontinued."
The cases in the 5th article required some act to be
done by the states to restore the property, because the
party was out of possession; but where the party
was already in the possession and enjoyment of the
property, no act of the states was necessary. It was
competent for the treaty to provide for the case; and
to stipulate, as the 6th article does in effect, that the
party shall not be put in a worse situation than he then
was in, either as to his person, his liberty, or his pro-
perty. The treaty did not consider property as con-
fiscated, if any further act was necessary to give the
state a complete legal title.

To ascertain the true construction of the 6th article
of the treaty, it is necessary to fix the meaning of the
term *confiscation.*

1. What is confiscation ?

2. On what principles does the right of confiscation
depend ?

1. To *confiscate*, is to transfer property from *private*
to *public* use. But the public cannot have the use of
property not known to exist. The state of Maryland
had not the use of this property before it was disco-
vered in 1801. It was not before that time transferred
from private to public use, and, consequently, was not
confiscated.

2. The right to confiscate the property of an enemy *during* war is derived from a state of war, and is called one of *the rights of war.* The right originates in the principle of *self preservation.* It is a means of weakening the enemy, and of strengthening ourselves. 3 *Dallas,* 227. *Vat. lib.* 3. *c.* 8. § 138. *p.* 519. *Lib.* 3. *c.* 9. § 161. *p.* 541.

The right to confiscate ceases with the principle upon which it is founded. In time of peace we are, in no danger, and therefore self preservation will not then justify confiscation. We have no enemy to disable, and therefore no right to strengthen ourselves at the expense of another, although he *had been* an enemy.

But we are told that the state is not *now confiscating* the property of him, who was our enemy. That was done during the war. We are not now depriving him of the possession, and excluding him from the use of the land. All this was done during the war. And this is said in the same breath which admits that the party has remained in the possession, use and enjoyment of the land until this moment, and that the property was not discovered to have been the property of an enemy until twenty years after the end of the war. The right to confiscate the goods of an enemy is merely the belligerent right of capture. If the property be not *taken* during the war, it can never be seized afterwards. This property, while it remained undiscovered, could neither weaken our enemy, nor strengthen ourselves.

It would be difficult to establish the position by reason, or by the law of nations, that you can ever be placed in a situation where, although it be unlawful to pass an act *declaring* you will seize and confiscate enemies' property, yet that you *may* because you declared you *had* seized it when *in fact* you had not deprived him of the possession and use of it. As to him the effect is the same; and it is equally a just cause of hostility, whether in fact you take from him what he in fact held, without a previous declaration

SMITH
v.
MARYLAND.

of your intention to do so, or first make the declaration, and then do it. In order to evade the positive prohibition of the treaty, you set up a mere legal fiction in opposition to the truth of the case, and in violation of the spirit as well as the letter of a solemn national compact.

This construction deprives the words of all meaning and effect. It was absurd to make provisions against *future* confiscations, it every thing was already confiscated. No construction of a treaty is to be admitted which leads to an absurdity, or renders the treaty null and without effect. *Vattel*, 380, 381, 382.

It is contended that the first provision in the 6th article can never apply to Maryland, because there the confiscations were complete whether the property were discovered or not, and whether the state by its agents had taken the possession or not; the law having vested the *title and possession.* Let it be conceded that the law, of itself, had all these effects, yet the treaty, if fairly construed, annulled the *future operations* of the law, and prevented the state or its assigns, from making the confiscation more complete either by taking *actual* possession, or compelling the trustees to convey the legal estate.

We contend that the provision that no future confiscations shall be made, protects all property *in fact held* by British or American subjects *at the time of the treaty,* and prevents the laws of confiscation from having the least operation in respect to such property; or at any rate prevents the courts of justice from depriving the holder of the possession, and from forcing his trustee to convey, and from doing any other act to carry into effect an incomplete confiscation. Acts done under a law during its existence cannot be affected by the repeal of the law. But if a law authorizes an act to be done, but before the act be done, the law be repealed, there is no authority to do the act. So if the act be done in part, and be incomplete at the time of the repeal, nothing further can be done. The treaty was a repeal of all the confiscation laws, so

far as to suspend their confiscating effects; and no
court of judicature could carry them into execution.

The stipulation " that there should be no future
confiscations made," was not intended to prevent
the passing of *future* LAWS of confiscation. There
could be no right to pass such laws *during peace.*
Such laws would have been a most flagrant violation
of the law of nations; and would have been a good
cause of war.

If it be said that the stipulation was intended to
apply only to those states where the confiscation laws
were incomplete, we answer, that the confiscation was
incomplete even in the case now before the court.
The circumstance of an application to a court of
chancery to complete the title of the state, is conclu-
sive evidence that the title was not complete; and if
the title was not completely in the state, the confiscation
was not complete.

In those states where an inquest of office was ne-
cessary to gain a seisin by the state, such a proceeding
could not be had after the treaty; this point has been
admitted by all the states. No solid reason can be
given why the treaty should not equally bar a proceed-
ing in *equity,* to obtain the same object.

No reason can be given why one of the states more
than another should be enabled to derive a continuing
revenue from the discovery of property after the peace,
which had belonged to an enemy during the war.

If it be said that the act of confiscation vested the
equitable title in the state, and that that equitable title is
transferred to the complainants, Carroll and Maccubbin,
and that as in equity, what ought to have been done
is presumed to have been done, and therefore a con-
veyance is to be made now as if it had been made then;

We admit that this is true in ordinary cases of
equity; but this is not an ordinary case of equity;
there is no equity in compelling a forfeiture accruing

SMITH
v.
MARYLAND

*jure bel'i.* It is a mere exercise of superior power, or at most a case of the strictest law. It is not the province of a court of equity to enforce penalties and forfeitures, (especially those growing out of a state of war,) but to relieve against them. No man will contend that a British subject was bound in law, conscience, or morality, to make a disclosure of his property to his enemy, for the purpose of being deprived of it. The same right of war which justified *us* in confiscating the property of British subjects, justified *them* in concealing it.

The general purview of the 6th article of the treaty shows that the intention of the contracting parties was, that things should remain as they then were; no future confiscations were to be *made;* that is, no property was to be transferred from private to public use; no person then in possession was to be turned out on account of the part he took in the war; no prosecution was to be commenced; no person was to suffer any future loss or damage, either in his person, liberty or property, on that account. To deprive a man of his property, to turn him out of a possession which he had enjoyed until that moment, to deprive him of his daily bread, is to make him suffer a loss and damage on account of the part he took in the war, and is therefore a direct violation of the treaty.

The right of confiscation is in substance the same as the right of capture; it depends upon the same principle, the right of self preservation. If the property be taken *flagrante bello*, it becomes the property of the captor. But if it be not taken during the war, he cannot afterwards claim and take it because he might have taken it during the war, if he had known where it was. He cannot make it his own by a mere declaration that it is his. The right to *take* can only be exercised during the war. If there be only a declaration during the war, it does not change the property. At the cessation of hostilities, the right of capture ceases. The state of Maryland cannot say, I am not now taking *your* property. I only take my own; and it is my own because I declared it to be so during the war.

With much more truth might Great Britain, when we charge her with a violation of the 7th article of the treaty, by carrying away the *negroes*, and other property *of Americans*, say, I did not take away the property of the Americans; I only took my own. It was mine, not by a mere *declaration* that it was mine, but by an actual seizure of it during the war, and according to the rights of war.

But this construction of the 7th article is not admissible, because it would defeat the whole object and intent of that article. So we say the construction given by the courts of Maryland. to the term "*confiscations*," in the 6th article, is not admissible, because it defeats the whole object and intent of that provision.

The words of the act of *October*, 1780, c. 45. entitled " An act. to seize, confiscate and appropriate all British property within this state," are these : " Be it enacted," &c. " that all property within this state, debts only excepted, belonging to British subjects, *shall be* seized, and is hereby confiscated to the use of the state."

By the act of the same session, c. 49. entitled " An act to appoint commissioners to preserve confiscated British property," it is enacted, " William Paca, Uriah Forest, and Clement Hollyday, esquires, or any two of them, shall be, and are hereby appointed commissioners for the purpose of preserving all British property *seized* and confiscated by the act of the present session to seize, confiscate and appropriate, all British property within this state ; and that the said commissioners shall be, and are hereby declared to be in the full and actual seisin and. possession of all British property *seized* and confiscated by the said act, without any office found, entry, or *other* act to be done. And the said commissioners shall, and may, as soon as may be, appoint proper persons, in all cases that they may think necessary, *to enter into*, and take possession of any part of the said property, and to preserve and keep the

same from waste and destruction, or to occupy and employ the same for the benefit of the public, and to *inventory* the same, or any other of the said property which the said commissioners may not think proper or necessary to put into the keeping of any person as aforesaid; and the said commissioners shall return *to the* NEXT *general assembly* a list or account of all such British property by them discovered, to whom the same belonged, the persons, if any, to whose keeping they committed the same, and the sums to which the same shall be valued in the next valuation of property; and the inventory aforesaid shall also be returned to the general assembly, with the list or account aforesaid; but in case any person shall be in possession of any of the said property, and claim the same, such property shall not be taken out of his possession, if he gives good and sufficient security, in double the value thereof, that the same, if moveable, shall be produced when called for by the commissioners, not any way damaged, or injured, or, if real, that no waste or destruction shall be committed thereon, but that the same shall be kept and preserved in as good order and repair as the same may then be in, until the title thereto shall be determined."

By the 4th section of the same act it is enacted, "that the said commissioners are also hereby declared to be in the full and actual seisin and possession of all property within this state which belonged to any person *outlawed* for treason; and may appoint proper persons to take care of and preserve the same from waste or destruction, and inventory and return the same to the general assembly at the *next* session, in the same manner as if the same was confiscated British property, to the end that proper measures may be taken for the disposition thereof in the manner most advantageous for the public, and the purpose to which the same is appropriated."

These acts clearly contemplate an *actual seizure* of the property during the existence of the war. The title of the first act is, " to *seize*, confiscate, and appropriate;" and the enacting clause declares, that the pro-

perty " *shall be seized.*" The second act declares the commissioners to be in the full and actual seisin and possession of all British property *seized* and confiscated by the former act. It also authorizes the commissioners to appoint other persons to enter and take possession. It directs an account of the property discovered to be returned to the *next* general assembly, and it provides that if the party in possession claim title, he shall not be turned out of possession, until the question of title be decided.

The act of the same session, *c.* 51. *section* 6. speaks of certain manors and lands, " which are *seized* and confiscated as British property, in *consequence* of the said act." And the preamble of the 8th section of the act of November, 1802, *c.* 100. *sect.* 8. under which Carroll and Maccubbin claim a right to apply to a court of equity in the name of the state, speaks of the discoverers of property *liable* to confiscation, in the following terms: " Whereas many persons have made discoveries of British property, confiscated property, or *property liable to confiscation*, to the governor and council, the late intendant and late agents of the state, and have made application to purchase the same upon the terms held out by law to the discoverers ; and whereas there is no person invested with authority to estimate the value, or fix a reasonable price for the said property, and to compound with the person or persons making such discovery, or with the person or persons applying to purchase the same ; *Be it enacted*, that the governor and council be and they are hereby empowered to compound with all persons who have heretofore made discovery of British property, confiscated property, or property *liable* to confisc tion, either to the governor and council, the late intendant, or any of the state agents, and to allow not exceeding one third of the value of such property to any person or persons having made such discovery, and who shall make application to the governor and council on or before the first day of May next, to compound for and purchase the same, and the said governor and council are hereby authorized to dispose of such property to such applicants, and take bonds, with good and suffi-

SMITH
v.
MARYLAND.

cient security, to be approved of by the treasurer of the western shore, for the purchase-money, bearing interest payable to the state at the periods that may be agreed on."

The 9th section provides, that if the discoverer " shall not *make known* to the governor and council the *title of the state* to the property aforesaid" before the 1st of May, then next, &c. the governor and council are to sell and dispose of the " *state's right*" to the property, &c.   And by the 10th section it is enacted, " that it shall and may be lawful for any person or persons purchasing as aforesaid any *confiscated* British property under the authority of this act, to prosecute any suit or suits, either in law or *equity*, in the *name of the state*, for the recovery of said property *for their use*: provided, that the said state shall not be liable to pay any costs incurred in prosecution of said suits;" " and provided also, that in all such sales so to be made by the governor and council, it shall be made known, and shall be a condition thereof, that they only sell the right of the state thereto, and that the state doth not guaranty the title to the same, or any part thereof, but that the purchase must be in all respects at the risk of the purchaser."

This act is clearly a legislative construction of the former acts respecting confiscation, and it takes a distinction between *British* property, and *confiscated* property, and property *liable* to confiscation; it supposes the existence of British property not confiscated; which could be no other than property which was once liable to confiscation, but which had never been actually discovered and seized.

But this land was, at the time of the British treaty of 1794, *holden* by a British subject, through the medium of a trustee, so that it is a case within the benefit of the 9th article of that treaty.

As to the question of jurisdiction of the courts of the United States, the real question in the case is, whether the property was, before the treaty of peace,

actually confiscated, *within the meaning of that treaty.* It is a question upon the construction of the treaty only, and the judgment 'below has been against the right claimed under that treaty, and is therefore clearly within the letter of the 25th section of the judiciary act of 1789.

*Ridgeley,* contra.

The act of Maryland, of October,* 1780, *c.* 45. actually and absolutely confiscates the property, whether found or not. And the act of the same *session, c.* 49. declares the commissioners to be in the actual seisin and possession of the property; "without any office found, entry, or other act to be done."

The courts of the United States have not jurisdiction in the case, because the only question is whether, by the laws of Maryland, the pr perty was completely confiscated before the treaty of peace. If it was, the treaty does not apply; if it was not, the treaty protects it. The laws of Maryland are to be construed by this court as they are construed in Maryland; and the judgment in this very suit is conclusive evidence of the construction given to their laws by the courts of that state.

The acts of confiscation make no distinction between legal and equitable estates.

*Harper,* on the same side.

This case presents two questions. The first, upon the jurisdiction; the second, upon the construction of the act of Maryland.

1. This is not a case depending upon the construction of the treaties, but upon the laws of Maryland. If by those laws the property was not confiscated before the treaty of peace, we admit that it cannot now be confiscated. If it was confiscated, the treaty does not apply. The general understanding in Maryland, and the uniform decisions of their courts have been,

SMITH
*v.*
MARYLAND.

that the act of assembly completely confiscated all British property within that state, without office found, or entry, or seizure; so that at the peace there could not be any future confiscations, because, no British subject could then hold lands in Maryland. This is an answer to both treaties. The courts of Maryland are the exclusive judges of the construction of the laws of that state.

If this court can take cognisance of the cause, the only question which they can decide is that which arises upon the construction of the treaty. The question of construction of the acts of Maryland is not open to this court.

*Jones*, in reply.

The right of Mrs. Ottey was not of such a nature as to be within the description of the act of assembly; and as it was a highly rigorous and penal law, creating a forfeiture of lands, it ought to be strictly construed. To include the case of a *cestui que trust* would require a special description. The only term used in the act is "*property*," which, in its general and most obvious signification, means the legal title and possession of the thing itself. By the common law, no trust estate or use was forfeitable for treason; and an alien might hold and enjoy the profits of land through the medium of a trustee. 4 *Com. Dig.* 231. 2 *Coke*, 513. 2 *Inst.* 18, 19. 21. And this principle respecting forfeitures applies to confiscations. 3 *Inst.* 227.

By the act of Maryland itself, no property was confiscated until it was first *seized*, and it could not be seized until it was *found*. But the question is not whether it was a confiscation of the kind contemplated by the act of Maryland, but whether it was a confiscation of the kind contemplated by the treaty. Treaties, especially those which put an end to the miseries of war, ought to be construed with liberality, and according to the spirit of the contract, and the intention of the parties. The confiscation contemplated by the acts of Maryland, if the construction be correct which ha

been given to them by their courts, was not an actual confiscation *de facto*, but a confiscation in contemplation of law. So far as it could be supposed to apply to property not discovered nor seized, it was a mere *fiction of law*. The contracting parties to the treaty could only have intended *actual confiscations de facto;* cases where in truth the property had already been seized and converted to public use. The spirit of the treaty is clearly discovered, from the whole tenor of the instrument, to be, that nothing which was not already actually converted to the public use should be taken from the individual on account of the part taken in the war. A future seizure of the property holden by the individual; a future conversion of it to public use, was therefore a *future confiscation* within the letter and the spirit of the prohibition contained in the 6th article of the treaty. The negotiators of that treaty must be presumed to have been perfectly acquainted with the laws of England relating to treason, and forfeitures of every kind. It was known that even by the high prerogative of the crown, the king gained no title until *actual* seizure. The writ of seizure was a necessary consequence of an office found. 2 *Inst.* 206, 207. 573. 689. Until entry or seizure there was only a *possibility* of an estate which was to be gained by entry. The seizure or entry is the commencement of the title. *Co. Litt.* 118. a. 12 *Mod.* 92. *Roberts* v. *Witherhead.* This seems also to have been the opinion of the legislature of Maryland, when they declared that the property should be *seized* and confiscated; and when they passed the subsequent acts of 1797, *c.* 119. and 1802, *c.* 100.

The right of Mrs. Ottey is protected by the clauses of the 6th article of the treaty of peace, prohibiting future confiscations and future loss on account of the part taken in the war; and by the 9th article of the treaty of 1794, in favour of those who then held lands in the United States. Mrs. Ottey then held the land; if not at law, yet she did in equity; and as this is a suit in equity, the court will consider her as within the equity of the treaty.

SMITH
v.
MARYLAND.

*March* 16.

WASHINGTON, J.* delivered the opinion of the court, as follows:

This cause comes before the court upon a writ of error to the court of appeals of the state of Maryland; and the first question is, has the supreme court of the United States appellate jurisdiction in a case like the present? It is contended, by the defendants in error, that the question involved in the cause turns exclusively upon the construction of the confiscation laws of the state of Maryland, passed prior to the treaty of peace, and that no question, relative to the construction of that treaty, did or could occur. That the only point in dispute was, whether the confiscation of the lands in controversy was complete, or not, by the mere operation of those laws, without any further act to be done. If the former, it was admitted, on the one side, that the right of Ann Ottey, the British subject, was not saved or protected by the treaty; if the latter, then it was agreed, on the other, that it was protected, and that no proceedings subsequent to the treaty, in order to perfect the confiscation, could be supported.

This argument proves nothing more than that the whole difficulty in this case depends upon that part of it which involves the construction of certain state laws, and that the operation and effect of the treaty, which constitutes the residue of the case, is obvious so soon as that construction is settled. But still the question recurs, is this a case where the construction of any clause in a treaty was drawn in question in the state court, and where the decision was against the title set up under such treaty? The only title asserted by the defendants in error, to the land in dispute, is founded upon an alleged confiscation of them by the state of Maryland, and a conveyance to them of the right thus acquired by the state. The title set up by the

* The Chief Justice did not sit in this cause. The judges present were Washington, Johnson, Livingston and Todd.

SMITH
v.
MARYLAND.

plaintiffs in error, for Ann Ottey, and the only one which could possibly resist that claimed by the grantees of the state, is under the treaty of peace; the 6th article of which protects her rights, provided the confiscation, by the laws of the state, was not complete prior to the treaty. The point to be decided was and is, whether this be a case of future confiscation, within the meaning of the 6th article of that treaty; and, in order to arrive at a correct result in the decision of that point, it became necessary, in the state court, and will be necessary in this, to inquire whether the confiscation, declared by the state laws, was final and complete, at the time the treaty was made, or not? The construction of those laws, then, is only a step in the cause leading to the construction and meaning of this article of the treaty; and it is perfectly immaterial to the point of jurisdiction, that the first part of the way is the most difficult to explore. Although the defendant's counsel admit, and the supreme court of the state may, in this particular case, have decided, that, where the confiscation is not complete before the treaty, the estate attempted to be confiscated is protected by the treaty, still, if, according to the true construction of the state laws, this court should be of opinion that the acts of confiscation left something to be done necessary to the perfection of the title claimed under them, which was not done at the time the treaty was made, we must say that, in this case, the construction of the treaty was drawn in question, and that the decision of the state court was against the right set up, under the treaty, by one of the parties.

This leads to the consideration of the merits of the cause, which depend upon the question before stated, viz. whether the confiscation of the lands in question was so far complete by the laws referred to, that the title and estate of Ann Ottey was devested out of her and vested in the state, prior to the treaty of peace? This must depend upon the true construction of the acts passed in the year 1780, chapters 45. and 49. as it is not pretended that any proceedings were instituted in the nature of an office, to complete the forfeiture

SMITH
v.
MARYLAND.

of these lands, upon the ground of alienage or other-wise.

The first law declares generally that " all property within this state, belonging to British subjects, debts only excepted, shall be seized, and is hereby confiscated to the use of this state." Anticipating, as it would seem, that questions might arise, after peace, in respect to lands not proceeded against according to the rules of the common law, the legislature, in the same session, passed a second law, appointing certain commissioners, by name, to preserve all British property seized and confiscated by the former law, and declaring the said commissioners to be in the full and actual seisin and possession of all British property seized and confiscated by the said act, without any office found, entry, or other act to be done, with power to the said commissioners, to appoint fit persons to enter and take possession of said property, for the purpose of its preservation.

It would seem difficult to draught a law more completely operative to devest the whole estate of the former owner, and to vest it in the state. The arguments against giving to these laws such an effect are, that the expressions used in these laws do not import a confiscation of merely equitable estates, and that no estates were intended to be confiscated, but such as were discovered and seized into the hands of the state, prior to the treaty.

It is true that the word *property*, used in both laws, means the thing itself, intended to be affected by them, whether it were land or personal property ; but then it is equally clear that the thing itself, whatever it might be, ceased, by the operation of these laws, to belong to the British subject, and became vested in the commissioners, for the use of the state. The *cestui que trust*, though not in possession of the property, was, nevertheless, the real owner of it; and, if the property or thing itself had come into the actual possession of the commissioners, who would have held it to the use of the state, it would seem difficult to maintain the position, that a scintilla of interest

or estate remained, for an instant afterwards, in the former owner.

But no act of the commissioners was necessary in order to obtain seisin in the land, to support the use thus transferred from Ann Ottey to the state. No seizure was necessary. The second law considers that all property belonging to British subjects was, by the mere operation of the first law, seized and confiscated; and declares that the commissioners were then in the full and actual seisin and possession of the property, so seized and confiscated by the first law, though no entry or other act had or should be made or done.

Being thus in the actual seisin, under the second law, which seisin had been declared, by the first law, to enure to the use of the state, it is perfectly immaterial at what time the right of the state to the lands, now in controversy, thus completed prior to the treaty, was discovered, or at what time actual seisin and possession was obtained. From the time that the second law came into operation, the possession of the trustees of Ann Ottey either ceased to be legal, or it was to be considered as the possession of the commissioners to the new use which had been declared by law. The present suit is between persons claiming under the state, and others who either held the lands wrongfully, or for the use of the state, and it is, in no respect, necessary to the perfection of the change of the property produced by the laws of confiscation.

Judgment affirmed, with costs.