(No. 28320.—

THE PEOPLE *ex rel.* Gustav W. Kunstman, Appellant, *vs.*
SHINSAKU NAGANO *et al.,* Appellees.

*Opinion filed January 17, 1945.*

JAMES W. BREEN, of Chicago, for appellant.

C. LYSLE SMITH, of Chicago, for appellees.

Mr. CHIEF JUSTICE FULTON delivered the opinion of the court:

Novel but important questions have been raised herein by a challenge of the constitutionality of certain clauses of the Aliens Act of Illinois providing for the forfeiture of an alien's real estate, under certain circumstances and by certain procedure, held by him for more than six years. It is a case of first impression notwithstanding the law has been on our statute books since 1897. The complaint, in the nature of an information, was dismissed by the superior court of Cook county upon motion of the principal defendant, (the alien,) whereby this appeal involves only issues well defined by the pleading.

For a better understanding of the discussion to follow, it is perhaps desirable to first refer to the applicable provisions of said Aliens Act, which appears as chapter 6 of the Illinois Revised Statutes of 1943. By section 1 all aliens are permitted to acquire and hold title in fee simple, or otherwise, to lands, tenements and hereditaments situated in this State, by deed, devise or descent, and may sell, encumber or devise the same; and the title thereto, of which an alien may die seized intestate, shall descend to his heirs-at-law even though such heirs be aliens. The foregoing rights, however, are subject to the limitations of section 2 which, although quite extensive, we here set

forth in full because it is the section particularly under attack.

"2. If any alien shall at the time of acquiring title to lands situate in this state be of the age of 21 years or upwards, he may hold title to the same for six years from and after the time of acquiring such title; but if any alien shall at the time of acquiring title to lands situate in this state be under the age of 21 years he may hold title to the same for six years from and after the time when he becomes 21 years of age, and if at the end of the time above limited, such lands shall not have been conveyed to bona fide purchasers for value, or such alien shall not have become a citizen of the United States, it shall then be the duty of the state's attorney of the county in which said lands are situate to proceed by information, in the name of the People of the State of Illinois, in the circuit court of such county, to compel a sale of said lands, and such court shall have jurisdiction to hear and determine such information and to order the sale of such lands by master in chancery, special commissioner, or other officer, for that purpose appointed by said court, at such time and place and upon such terms as the court may direct, but such sale shall be made subject to all incumbrances by way of judgment or mortgage, or otherwise, existing against such lands at the time of the commencement of such proceedings.

"Notice to all parties interested shall be given as now authorized in other civil cases.

"It shall be a good defense to any such proceeding that prior to the time that the same was commenced, such alien had become a citizen of the United States, or that the title to such lands had been conveyed in good faith by such alien, mediately or immediately, to a citizen of the United States, or if such alien has deceased prior to the time of the commencement of such proceeding, that his heirs or devisees, or any person claiming by, through, or under them, are or had become citizens of the United States.

"Said court shall tax as costs such fees for the state's attorney as shall be reasonable, not exceeding 20 per centum of the amount which shall be bid for such lands at any such sale thereof, and shall allow to such master in chancery, special commissioner, or other officer making such sale the same fees as are allowed by law to masters in chancery for the sale of lands under decree of foreclosure of mortgages and all fees and costs shall be paid out of the proceeds of sale of such real estate.

"If any state's attorney shall neglect or refuse to proceed by information as hereinbefore provided, within thirty days after it shall be brought to his notice that an alien is holding title to lands in this state contrary to the provisions of this act, then any citizen may proceed by information, in the name of the People of the State of Illinois in the same manner as such state's attorney might have proceeded under the provisions of this section, and he and his attorney may be allowed such reasonable fees for their services, to be taxed as costs, as the court may direct, not exceeding in the aggregate 20 per centum of the amount which shall be bid for such lands at any such sale thereof."

Section 3 provides that a sale of lands pursuant to section 2 shall be confirmed by the court and the net proceeds transmitted to the State Treasurer, who shall hold the same as the property of the State of Illinois. By section 4, possession of such lands so sold is required to be delivered by the alien to the purchaser within ten days after the purchaser shall exhibit the deed executed by the officer of the court making the sale. The remaining sections of the act deal with other matters which are inapplicable except possibly section 7 which provides that all aliens may acquire and hold personal property in the same manner and to the same extent as natural born citizens of the United States.

. According to the information, Shinsaku Nagano (sometimes known as Shimasu Nogano,) was born in Japan and remains a subject of the Japanese government, never having become a naturalized citizen of the United States, although he has lived here since at least 1926. In that year Nagano acquired, by purchase, the fee-simple title to two pieces of real estate in Chicago generally known as 311-317 W. Hubbard street and 441-459 W. Huron street. It is next alleged that Nagano was more than twenty-one years of age when he purchased said real estate and that he has never conveyed it to a *bona fide* purchaser for value or in good faith to a citizen of the United States. However, it is stated in the information that on December 15, 1939, Nagano conveyed the Hubbard street lots to the Evanston Trust & Savings Bank, as trustee, by a deed in trust in common usage in Illinois, which recites, among other things, that the interest of the beneficiary is personal property. On February 23, 1940, he conveyed the Huron street property to the same trustee under the same form of deed in trust, both conveyances being pursuant to a trust agreement between Nagano and the bank known as Trust No. 380. Both deeds in trust were also joined in by the wife of Shimasu Nogano, the latter, however, being the only beneficiary under said Trust No. 380.

The information then alleges that on or about December 9, 1943, E. Nye Johnson, a resident of Chicago and a citizen, called the attention of the State's Attorney of Cook county, Illinois, to the foregoing facts by sending said State's Attorney a written communication thereof which was, in fact, received on December 11, 1943, by registered mail. That notwithstanding such communication said State's Attorney failed during the following period of thirty days to proceed against Nagano in accordance with the terms of section 2 of the above-quoted act.

Accordingly, the information was filed January 11, . 1944, in the name of the People of the State of Illinois

on the relation of one Gustav W. Kunstman, a resident of Chicago and a citizen of the United States, but without the consent, approval or signature of the State's Attorney of Cook county. In addition to Nagano, five other parties were made defendants to the information, three of them being lessees occupying certain parts of the premises in question, the fourth being New England Mutual Life Insurance Company which had a large mortgage on one of the properties, and the last being the Evanston Trust & Savings Bank because of its interest as aforesaid. The prayer of the information was that a hearing be had at an early date and the defendants required to show cause why a sale of both parcels of real estate should not be decreed, subject to the prior liens and interests of all defendants except Nagano; that after a sale and confirmation thereof the court tax the costs including reasonable fees to the relator and his attorney, all in accordance with the further provisions of said Aliens Act.

The defendants were duly served with summons and all filed appearances or answers except Nagano who filed a motion to dismiss the complaint on the following grounds: (a) That section 2 of the Aliens Act authorizes a proceeding only in cases where an alien continues to hold title to land at the date of proceedings, with more than six years having expired since the acquisition of title, and such lands not having been conveyed in good faith to a citizen of the United States prior to commencement of suit; (b) that the lands in question were, in fact, conveyed to a citizen of the United States, *i.e.,* the Evanston Trust & Savings Bank, as trustee, several years prior to the filing of this suit; (c) that the conveyances to the trustee were by deeds in trust, under which the entire legal and equitable interest of Nagano was vested in the trustee and the only interest of said defendant was personal property; (d) that under section 7 of the Aliens Act all aliens may acquire and hold personal property to the same extent as natural

born citizens of the United States; (e) that the good faith of the conveyance by Nagano to the bank, as trustee, is shown by the fact that said trustee thereafter executed a $50,000 trust deed on said real estate to the defendant New England Mutual Life Insurance Company; (f) that the part of section 2 authorizing such a suit as this to be brought by the relator and his own personal attorney is void, unconstitutional, and contrary to public policy in that (1) it violates public policy by permitting private usurpation of exclusively governmental functions which should be exercised only by the State's authorized officers, (2) that the present suit is for private speculation and gain, and (3) the State's Attorney of Cook county and the Attorney General of the State of Illinois are the sole constitutional representatives of the State in proceedings by the State affecting a public interest, and the statute which purports to authorize a private person to bring such suit is unconstitutional because the legislature lacks authority to strip the State's Attorney or Attorney General of the inherent functions of their offices; and (g) the proceedings in question violate the due process clauses of the State and Federal constitutions.

Before taking up a consideration of the case on its merits we are met with a motion by appellee Nagano to dismiss the appeal for failure of appellant to properly abstract the notice of appeal and proof of service thereof. While it is true that Rule 38 of this court requires that the party prosecuting an appeal shall furnish a complete abstract of the record, we have always avoided a harsh construction of said rule except for flagrant disregard thereof. The abstract in this case is not as complete as might be desired but it does refer to the notice of appeal and proof of service thereof. In fact, the notice of appeal is set forth in full and appellee Nagano makes no contention that it was not regularly and properly filed or served. Under similar circumstances, a motion to dismiss the appeal

was denied in *People ex rel. Sandberg* v. *Grabs,* 373 Ill. 423, and we adhere to that ruling in the instant case.

As already indicated, the trial court sustained defendant Nagano's motion and dismissed the information of the relator. Upon which one of the grounds of the motion the trial court relied is not disclosed by the record, but, of course, if any one is well founded, that would be a sufficient basis for sustaining the judgment. Points (a) to (e) of defendant's motion may be summarized as contending that the present proceeding does not lie because Nagano had conveyed the property in good faith to a citizen of the United States, although such was done after holding title for more than six years. If the deeds in trust to the Evanston Trust & Savings Bank had that legal effect, such would, of course, be a complete defense because, under section 2 of the act, it is specifically provided that "it shall be a good defense to any such proceeding that prior to the time that the same was commenced * * * title to such lands had been conveyed in good faith by such alien * * * to a citizen of the United States, * * *."

However, under points (f) and (g) of his motion appellee challenges the right of relator to bring this proceeding as a private citizen and, of course, if such contention is well founded it would become unnecessary to here consider the effect of the deeds in trust. We must, therefore, first consider the procedural aspects of section 2.

Appellant, Kunstman, approaches this matter by arguing that the General Assembly of the State of Illinois has full power to regulate and limit the right of aliens to hold and convey real estate in this State. Except as limited by any treaty between the United States and the government of the country of which an alien is a subject or citizen, appellant's statement is unquestionably true. It was so held in the case of *Wunderle* v. *Wunderle,* 144 Ill. 40, which sustained, against all objections there urged, the constitutionality of our Aliens Act of 1887. Thus, we there said:

"It is a general rule of the common law, that the title to real property must be acquired and passed according to the *lex rei sitae*. This rule not only applies to alienations and acquisitions made by the acts of the parties, but also to estates and rights acquired by operation of law. \* \* \* From it results the doctrine, that the title of aliens to land within the limits of the several States is a matter of State regulation. \* \* \* But while it is true that 'the right of foreigners to hold title to real estate is entirely dependent on the laws of the State in which the land is situate' (2 Wharton's Int. Law Dig. sec. 201, page 490,) it is also true that the State law must give way if it conflicts with any existing treaty between the Government of the United States and the government of the country of which such foreigner is a subject or citizen."

However, we do not conceive the case at hand to involve the constitutionality of section 1 of the present Aliens Act and it is only as to the provisions there incorporated, regarding the rights of aliens to own and inherit real estate, that the *Wunderle case* would have any direct application. We repeat that we are here concerned with the procedural aspects of section 2 of the present act.

In attacking the right of a private citizen to proceed under section 2, counsel for appellee Nagano turns back the pages of legal lore to the decision of the United States Supreme Court in *Fairfax's Devisee* v. *Hunter's Lessee,* 7 Cranch 603, 3 L. ed. 453. While that case was decided in 1813, it is perhaps not surprising that reference to such a comparatively ancient authority must be made because of the unusual nature of this proceeding and the infrequency with which the courts have had occasion to make inquiry along these lines. It throws considerable light upon the accepted common-law rights of an alien to acquire or inherit land and the procedure for taking the lands of an alien, and for that reason must be gone into at some length.

It appears from the opinion of Justice Story that Lord Fairfax, being a citizen and inhabitant of the State of Virginia, died in December, 1781, owning a vast tract of land in the northern neck of Virginia. By his last will and testament he devised said lands in fee to his nephew, Denny Fairfax, a native-born British subject who never became a citizen of the United States but always resided in England. In 1789, which was after the Revolutionary War but before the death of said Denny Fairfax, part of the lands devised to him were included in a patent by the Commonwealth of Virginia to one of its citizens, a David Hunter. The authority for this land patent by the Commonwealth of Virginia was rested on certain acts of its assembly passed during and immediately following the Revolutionary War, purporting to vest, or providing means for vesting, in the commonwealth, title to all lands then held by alien enemy British subjects. Said patentee, David Hunter, immediately entered into possession of the land and after leasing it brought an ejectment suit again Denny Fairfax. The latter died during the pendency of the suit but both he and his heirs claimed that they, in fact, owned the superior title to the land in question.

Whether, because he was an alien enemy, Denny Fairfax ever acquired title by the devise of his uncle, Lord Fairfax, and whether, if he did receive title by the devise, he lost it because of the legislative acts of Virginia, thus became the controlling questions. The effect of certain treaties between the United States and Great Britain also was involved but inasmuch as those were entered into subsequent to the legislative acts of Virginia, his prior status while an alien without the protection of the treaties had to first be determined.

To resolve those issues, Justice Story himself turned to Blackstone and other dignitaries of the common law, from whom he concluded as follows: "It is clear by the common law, that an alien can take lands by purchase, though

not by descent; or in other words he cannot take by the act of law, but he may by the act of the party. * * * Nor is there any distinction whether the purchase be by grant or by devise." And, having determined that an alien could, at common law, at least become seized of an estate in realty by purchase or devise, the learned Justice then went on to hold: "It is incontrovertibly settled upon the fullest authority, that the title acquired by an alien by purchase is not divested *until office found.* The principle is founded upon the ground, that as the freehold is in the alien, and he is tenant to the lord of whom the lands are holden, it cannot be divested out of him but by some notorious act, by which it may appear that the freehold is in another. (1 Bac. Abr. Alien C. p. 133.) Now an office of entitling is necessary to give this notoriety, and fix the title in the sovereign. * * * And until the king be in possession by office found, he cannot grant lands which are forfeited by alienage."

At this juncture perhaps it would be illuminating to refresh ourselves on the meaning of the terms "office found," or its equivalent "inquest of office," which have become so important in this discussion. The best definition we have found appears in another decision of the United States Supreme Court, *Phillips* v. *Moore,* 100 U. S. 208, 25 L. ed. 603. In connection with a similar question, the court there stated: "By the common law, an alien cannot acquire real property by operation of law, but may take it by act of the grantor, and hold it until office found; that is, until the fact of alienage is authoritatively established by a public officer, upon an inquest held at the instance of the government. The proceeding which contains the finding of the fact upon the inquest of the officer is technically designated in the books of law as 'office found.' It removes the fact, upon the existence of which the law divests the estate and transfers it to the government, from the region of uncertainty and makes it a matter of record.

It was devised, according to the old law writers, as an authentic means to give the King his right by solemn matter of record, without which he, in general, could neither take nor part with anything; for it was deemed 'A part of the liberties of England, and greatly for the safety of the subject, that the King may not enter upon or seize any man's possessions upon bare surmises, without the intervention of a jury.' "

Returning now to the *Fairfax case,* it appears that, in applying the foregoing principles to the first question there involved, Justice Story readily concluded that the alien, Denny Fairfax, had a complete, though defeasible, title by virtue of the devise from Lord Fairfax and that no grant by the Commonwealth of Virginia could be valid until such title was divested by office found. It was admitted that no such inquest of office was ever made pursuant to the acts on that subject. Accordingly, the court pointed out, there was little reason to doubt that the Virginia land patent to Hunter in 1789 was issued improvidently and erroneously, and passed nothing.

However, it was further contended by Hunter's lessee that the inquest of office had been dispensed with by the acts of the Virginia Assembly so as to make its grant to Hunter complete and perfect. As to this point Justice Story observed, "we will not say that it was not competent for the legislature (supposing no treaty in the way,) by a special act to have vested the land in the commonwealth without an inquest of office for the cause of alienage. But such an effect ought not, upon principles of public policy, to be presumed upon light grounds; that an inquest of office should be made in cases of alienage, is a useful and important restraint upon public proceedings. * * * It prevents individuals from being harassed by numerous suits introduced by litigious grantees. It enables the owner to contest the question of alienage directly by a traverse of the office. It affords an opportunity for the public to know

the nature, the value, and the extent of its acquisitions *pro defectu haeredis;* and above all it operates as a salutary suppression of that corrupt influence which the avarice of speculation might otherwise urge upon the legislature. The common law, therefore, ought not to be deemed to be repealed, unless the language of a statute be clear and explicit for this purpose."

It was concluded by the court that the lands in controversy were never, by any act of the Virginia Assembly, vested in the commonwealth, and, no office found having been taken, the Fairfax title prevailed. Finality of title was assured by the further holding of the court that any inchoate right of the Commonwealth of Virginia had become ineffectual and void by operation of the treaty with Great Britain in 1794.

The principal conclusion which counsel for appellee Nagano draws from the *Fairfax case* is that section 2 of our Aliens Act is void in its entirety as an unconstitutional attempt to dispose of property in which the State has not theretofore established title in itself, by escheat or other appropriate proceeding; and that any such attempt amounts to the taking of property without due process. In other words, that any proceeding under section 2, even by a State's Attorney or the Attorney General, is in the nature of a collateral attack in the absence of prior escheat to the State; and that title to such land can no more be conveyed by a master's deed than could the Commonwealth of Virginia patent the land to Hunter in the *Fairfax case.* With this we decidedly cannot agree. That is, we are fully satisfied that it is not necessary, from a constitutional standpoint or otherwise, to first have the State of Illinois, or one of the counties, actually vest itself with the title to the real estate of an alien which he has held for a period of time contrary to that which may be provided by statute.

To use the term "escheat," or attempt to compare our statute on that matter, is not strictly proper because escheat

is an automatic vesting of title in the lord of the fee upon the death of an intestate without lawful heirs. The fee to real estate cannot be in abeyance and thus the title must rest in someone. In modern theory, the State is the original and ultimate proprietor of all lands within its limits and thus the State takes not as an heir, but as a sovereign. (21 C. J. pp. 848-860.) In Illinois the county where the land is situated has been designated as the subdivision of the sovereignty to receive title to lands which escheat. (Ill. Rev. Stat. 1943, chap. 49.) To assure due process, our escheat statute has further provided that the county must perfect its title through certain judicial procedure by the State's Attorney. While such a proceeding is in the nature of an inquest of office, it does not have the purpose and effect of actually divesting title as is the case when alienage is involved. Since an alien continues to hold title until divested there is no real need to have title pass to the county provided there is otherwise due process, which, we believe, will be clearly demonstrated insofar, at least, as direct sale by a judicial officer is involved.

A careful analysis of the *Fairfax case* discloses that it only goes so far as to hold that the title of an alien, yes, even an alien enemy, acquired by purchase or devise, can not be divested without office found or its equivalent. Justice Story specifically conceded that it would have been competent "for the legislature (supposing no treaty in the way,) by special act to have vested the land in the commonwealth without an inquest of office for the cause of alienage." At another point the opinion states: "But if the construction which we have suggested be incorrect, we think that, at all events, the title of Hunter, under the grant of 1789, cannot be considered as more extensive than the title of the commonwealth, *viz.,* a title inchoate and imperfect; to be consummated by an actual entry under an inquest of office or its equivalent, a suit and judgment at law by the grantee."

Our interpretation of the *Fairfax case* appears to be fully sustained by later decisions of the United States Supreme Court. Thus, in *United States* v. *Repentigny,* 5 Wall. 211, 18 L. ed. 627, which involved the title to certain lands in Michigan, originally granted by the King of France, it was said, "and we agree that, before a forfeiture or reunion with the public domain could take place, a judicial inquiry should be instituted, or, in the technical language of the common law, office found or its legal equivalent. A législative act directing the possession and appropriation of the land is equivalent to office found. The mode of asserting or of assuming the forfeited grant, is subject to the legislative authority of the government. It may be after judicial investigation, or by taking possession directly, under the authority of the government, without these preliminary proceedings. (*Fairfax* v. *Hunter,* 7 Cranch, 603; *Smith* v. *Maryland,* 6 Cranch, 286.) In the present instance, we have seen that the laws have been extended over this tract, the lands surveyed, and put on sale, and confirmed to the occupants or purchasers, and, in the meantime, an opportunity given to all settlers and claimants to come in before a board of commissioners and exhibit their claims. This is a legislative equivalent for the reunion by office found." It will be noted that one of the authorities there relied on was the *Fairfax case,* and the court specifically held the mode of asserting or assuming forfeited land to be "subject to the legislative authority of the government." To the same effect, see *Atlantic & Pacific Railroad* v. *Mingus,* 165 U. S. 413, 41 L. ed. 770, and cases annotated in 15 L. R. A. (n.s.) 379.

A like conclusion follows from any logical sequence of reasoning we might pursue. Thus, if it is proper for the legislature to entirely dispense with inquest of office and vest the lands of an alien in the State by direct enactment (and all of the authorities so agree, subject to any defense he might assert so as to assure due process,) then certainly

the less extreme act of the legislature, changing merely the procedure by which office found is accomplished, cannot be improper. It is the purpose and reason behind office found which we should protect, but there is nothing indispensable in the precise method of arriving at the result. It originated as a salutary restraint upon the exercise of arbitrary power by the Kings of England and afforded the subject full protection by allowing him to contest the claim of his sovereign.

The same restraint and the same protection are afforded by sections 2 and 3 of the Illinois Aliens Act insofar as notice and the right to defend are concerned. The alleged alien and all other persons having an interest in the real estate must be made parties to the information and served with process as in other civil cases. The alienage, period of holding, and other applicable provisions of section 2 must be alleged and proved before title can be divested. The sale must be finally approved by the circuit judge. We can conceive of little else which might be devised to protect an alien. The fact that section 2 directs the land to be sold by a master in chancery, special commissioner, or other officer duly appointed for that purpose, upon such terms as the court may direct, affords no basis for complaint by the alien who, at best, has a limited right of ownership. If an alien is going to lose his land because he has held it more than six years contrary to statute, certainly it makes no real difference to him who acquires title thereafter. If the title were transferred to or confirmed in the county or State a resale would simply follow, and the effect, so far as the alien is concerned, would be the same.

Thus, upon the questions so far discussed as to the propriety of proceeding by information and judicial sale, we are of the opinion, as already indicated, that appellee Nagano's constitutional attack is not well founded. In reaching this conclusion, we have not overlooked the case

of *Vlahkos* v. *Andrews,* 362 Ill. 593, and do not consider it to be hereby adversely affected. That decision simply recognized the right of an alien to hold an interest in real estate against any collateral attack. The method by which the State or county could make a direct attack was not involved, although it was stated that some such proceeding as office found would be necessary. We have already shown that the Aliens Act provides an equivalent procedure which is entirely sufficient.

The second procedural aspect challenged by appellee Nagano relates to the right of a private citizen to bring this suit by his own attorney rather than having it instituted and carried on by the State's Attorney of Cook county where the land in question is situated. To sustain this contention, we are referred, principally, to the following cases: *Fergus* v. *Russel,* 270 Ill. 304, *People ex rel. Courtney* v. *Ashton,* 358 Ill. 146, and *Ashton* v. *County of Cook,* 384 Ill. 287. The *Fergus case* involved the constitutionality of an appropriation for legal services to be performed for the Insurance Department by attorneys other than the Attorney General. The objecting taxpayer contended that the Attorney General was a constitutional officer charged with the duty of representing the State and all its departments, whereby the legislature could not strip him of any such powers or duties. In sustaining such contention we held: "The office of Attorney General is created by section 4 of article 5 of the constitution of 1870. * * * It will be observed that the constitution confers no express powers upon the Attorney General and prescribes no express duties for him to perform. It simply provides that he shall perform such duties as may be prescribed by law. The office of Attorney General was one known to the common law, and under the common law the Attorney General had well known and well defined powers and it was incumbent upon him to perform well known and clearly prescribed duties. It is not necessary, and indeed it would

be difficult, to enumerate all the powers vested in the Attorney General at common law and all the duties which were imposed upon him to perform. It is sufficient for the purposes of the discussion of the point here involved to state that at common law the Attorney General was the law officer of the crown and its chief representative in the courts. * * * The common law is as much a part of the law of this State, where it has not been expressly abrogated by statute, as the statutes and is included within the meaning of this phrase. * * * By our constitution we created this office by the common law designation of Attorney General and thus impressed it with all its common law powers and duties. As the office of Attorney General is the only office at common law which is thus created by our constitution the Attorney General is the chief law officer of the State, and the only officer empowered to represent the people in any suit or proceeding in which the State is the real party in interest, except where the constitution or a constitutional statute may provide otherwise." The foregoing conclusion was based, to a large extent, on similar holdings in *People ex rel. Gullett* v. *McCullough,* 254 Ill. 9, and *Chicago Mutual Life Indemnity Ass'n* v. *Hunt,* 127 Ill. 257.

In the case of *People ex rel. Courtney* v. *Ashton,* 358 Ill. 146, next relied upon by appellee Nagano, there was involved the right of the board of commissioners of Cook county to employ private attorneys to collect delinquent real and personal property taxes. By analogy to the *Fergus case,* it was contended that the State's Attorney is likewise a constitutional officer invested with exclusive power to represent the public interests of a county and its other officers or departments. We pointed out that section 22 of article VI of our constitution provides for the election of State's Attorneys in each county and that section 32 of the same article provides for the performance of duties in similar language to that of section 1 of article V creat-

ing the office of Attorney General. Accordingly, we concluded: "The question arising in this connection is whether the county board has power to deprive the State's Attorney of those duties or transfer them to private counsel. In *Fergus* v. *Russel*, 270 Ill. 304, the duties of a constitutional officer, such as State's Attorney, are definitely stated, and it is there held that a legislative body may not strip a constitutional officer of his powers nor transfer them to others."

The third case relied upon by appellee Nagano involved a further attempt of the same attorney Ashton, who was a party to the case next above cited, and others, to collect from the county of Cook for legal services performed in the collection of delinquent real and personal taxes. Said attorneys filed suits to collect on their contracts with the county, or in the alternative, on a *quantum meruit* basis. The suits were dismissed, and our opinion in the consolidated appeals is reported as *Ashton* v. *County of Cook*, 384 Ill. 287. The contention there was "that the action of the board in employing private attorneys to perform such service was in effect taking a power and duty given by the constitution and statute to the State's Attorney and conferring it on another." In view of the *Fergus case*, and the other *Ashton case*, we, of course, sustained the defense urged.

It thus appears from a rather extended line of cases by this court that we have always viewed a State's Attorney as a constitutional officer with rights and duties analogous to or largely coincident with the Attorney General, though not identical, and the one to represent the county or People in matters affected with a public interest. This is not intended as a complete enumeration of his powers but it encompasses sufficient to make the rule of the *Fergus* and *Ashton cases* applicable to the question at hand. In coming to this conclusion we are not unmindful of the decision in *People ex rel. Hoyne* v. *Newcomer*, 284 Ill. 315. On the contrary, we believe it will be found to be distinguish-

able in one respect and otherwise in harmony with our present views. It was there held (1) that a municipal judge of Chicago was vested by law with a discretion in the manner of prosecution of the particular offenses involved, and (2) because of such discretion the State's Attorney could not enter a *nolle prosequi* without the approval of the court, even though the Attorney General normally has the unrestricted power to enter a *nolle prosequi* in any criminal case. The reason for such holding on the second point clearly lies in the following statement: "The disastrous consequences of endowing a State's Attorney with absolute and unlimited power to enter a *nolle prosequi* in all prosecutions of a certain class of crimes and leaving the people to the remedy of a prosecution against him for malfeasance in office are apparent." Thus, public interest was the decisive factor, just as we find it to be here. In the *Newcomer case* it was conceded that the power of the Attorney General of England "was not a matter of substantive law but of practice and prerogative." The practice there adopted and herein approved appear to be justified and supported by ample authority.

That a proceeding to divest any alien of real estate involves a public interest appears unquestionable. As pointed out above, the sovereign (here the county acting for the State) is the ultimate proprietor of all lands within its boundaries and by virtue thereof it, alone, possesses the power to regulate how real estate may be acquired and transferred. (*Wunderle* v. *Wunderle*, 144 Ill. 40.) All this, of course, in deference to due process and the treaties of the Federal government which are made supreme by article VI of the constitution of the United States. We have been referred to no such treaty with the Japanese Empire and do not find that one has ever been entered into which would give appellee Nagano protection as would be afforded the nationals of many countries with which the United States does have treaties. See *Hanenstein* v. *Lyn-*

*ham,* 100 U. S. 483, 25 L. ed. 628, and *Adams* v. *Akerlund,* 168 Ill. 632.

While the manner of conducting an inquest of office is equally obscure as its origin, we find it, without exception, to have been accepted from the common law as a judicial inquiry or proceeding. Thus, in *Atlantic & Pacific Railroad* v. *Mingus,* 165 U. S. 413, 41 L. ed. 770, the United States Supreme Court said: "* * * the remedy of the government is by an inquest of office or office found, a judicial proceeding but little used in this country, or by a legislative act directing the possession and appropriation of the land." Likewise, in the above quoted case of *United States* v. *Repentigny,* 5 Wall. 211, 18 L. ed. 627, the same court held, "and we agree that, before a forfeiture or reunion with the public domain could take place, a judicial inquiry should be instituted or, in the technical language of the common law, office found or its legal equivalent." And, it being a judicial proceeding in which the State is primarily interested, the proper officer to conduct it is the Attorney General or State's Attorney, as already shown. In fact, we can hardly conceive of it otherwise, for certainly the privilege to forfeit for alienage is not a prerogative of one but the collective right of all the citizens of the State.

Without the protecting arm of the State's Attorney, we can readily see how private citizens might inflict serious abuses on those whom they supposed were aliens subject to the provisions of the act in question. The last paragraph of section 2, now under consideration, would be an ideal weapon in the hands of a speculator, the shake-down artist, and the blackmailer, for they could not only threaten, but under the statute as it now stands, they could control the very processes of law once a suit is set in motion. One example of how an improper use might be made of the statute would be for the complaining citizen to dismiss the suit or cease further prosecution upon receiving a satisfac-

tory settlement from the accused. Further, where property of large value is involved (such as the information concedes the real estate here in question to be) the percentage allowable to the relator would enable him to outbid any unwelcome competitor who might appear at the sale.

It is argued by appellant that the last paragraph of section 2 of the present act does not entirely strip the repective State's Attorneys of the privilege to conduct such proceedings but only gives the right to a private citizen when the State's Attorney fails to act within thirty days. That is hardly a sufficient answer because the fact still remains that the State's Attorney (or Attorney General) is the only one within the contemplation of the constitution who could at any time prosecute such a suit. As pointed out in the *Fergus case,* his constitutional powers simply cannot be placed with persons not having the responsibility of the office in question. It is presumed that he will act under such a heavy sense of public duty and obligation for enforcement of all our laws that he will commit no wrongful act. If he does, the remedy must be by other well known means.

Although we are reluctant to interfere with the purpose and intent of the act in question, we must, upon what we conceive to be the correct principles of law, conclude that the last paragraph of section 2 is unconstitutional, the exact provisions thereof being again here set forth for the purpose of certainty: "If any state's attorney shall neglect or refuse to proceed by information as hereinbefore provided, within thirty days after it shall be brought to his notice that an alien is holding title to lands in this state contrary to the provisions of this act, then any citizen may proceed by information, in the name of the People of the State of Illinois in the same manner as such state's attorney might have proceeded under the provisions of this section, and he and his attorney may be allowed such reasonable fees for their services, to be taxed as costs, as the court may

direct, not exceeding in the aggregate 20 per centum of the amount which shall be bid for such lands at any such sale thereof." The instant case having been instituted and carried on under that paragraph, it follows that points (f) and (g) of defendant's motion to dismiss were well taken for the reasons hereinabove expressed, and are sufficient ' to sustain the judgment below. In view of this conclusion, it would be inappropriate to here consider any of the matters raised by points (a) to (e) of said motion. The judgment of the superior court of Cook county, for the reasons assigned, is affirmed.

*Judgment affirmed.*