Jane DOE and Sally Roe, suing on behalf of themselves and all others similarly situated, and David N. Danforth, M.D., Charles Fields, M.D., Ralph M. Wynn, M.D., and Frederick P. Zuspan, M.D., suing on behalf of themselves and all others similarly situated, Plaintiffs,

Mary Poe, by her mother, Pauline Poe, suing on behalf of herself, and all others similarly situated, Intervening Plaintiff,

v.

William J. SCOTT, Attorney General of the State of Illinois, and Edward V. Hanrahan, State's Attorney of Cook County, Illinois, Defendants,

Dr. Bart Heffernan, Intervening Defendant.

Civ. A. No. 70 C 395.

United States District Court,
N. D. Illinois, E. D.

Jan. 29, 1971.

Sybille Fritzsche, The Roger Baldwin Foundation of ACLU, Inc., Susan Grossman, Chicago, Ill., for plaintiffs; Marshall Patner, Patner & Karaganis, Chicago, Ill., of counsel.

Gordon H. S. Scott, Legal Aid Bureau, Chicago, Ill., for intervening plaintiff Mary Poe.

William J. Scott, Atty. Gen., Bernard Genis, Asst. Atty. Gen., Edward V. Hanrahan, State's Atty., Daniel Coman, James C. Murray, Asst. State's Attys., for defendants.

Dennis J. Horan, Thomas M. Crisham and Jerome A. Frazel, Hinshaw, Culbertson, Moelmann, Hoban & Fuller, Chicago, Ill., for intervening defendant Bart Heffernan.

Before SWYGERT, Chief Circuit Judge, ROBSON, Chief District Judge, and CAMPBELL, Senior District Judge.

## MEMORANDUM OPINION

SWYGERT, Chief Circuit Judge.

This is an action for declaratory and injunctive relief brought to declare that the Illinois abortion statute [1] is violative of the United States Constitution for one or more reasons.[2] After a three-judge district court was convened the parties were ordered to restrict their arguments to the allegations that the statute is unconstitutionally vague and unconstitutionally invades the privacy of pregnant women. Oral argument was heard, and the case is now before us on a multiplicity of motions including cross-motions of plaintiffs and defendants for summary judgment.

Plaintiffs Doe and Roe, suing anonymously on behalf of themselves and all other women similarly situated, assert that they were unable to obtain legal, medically safe abortions in Illinois because their physicians reasonably believed that they could not perform such an operation upon the plaintiffs without fear of prosecution by defendant law enforcement officials pursuant to the challenged statute. Plaintiff Doe, a woman of means, subsequently had a successful abortion performed in Great Britain, while plaintiff Roe, who is indigent, was compelled to bear an unwanted child since the option of a foreign abortion was economically foreclosed. Plaintiffs Danforth, Fields, Wynn and Zuspan, all licensed physicians, sue on behalf of themselves, and all other similarly situated physicians, alleging that the existence of the challenged statute interferes with and adversely affects their

---

1. Ill.Rev.Stat., ch. 38, § 23–1 (1969).

2. Jurisdiction is based upon 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331, 1343, 2201, 2202, 2281 and 2284.

ability to conduct their medical practices with proper regard for their patients' best interests. Intervening plaintiff Poe is a high school girl who was pregnant as a result of a forcible rape and sues anonymously by her mother as next friend, asserting the same claims as Doe and Roe.[3]

The principal defendants are William J. Scott, Attorney General of the State of Illinois, and Edward V. Hanrahan, State's Attorney of Cook County, Illinois. Both are law enforcement officials of the State of Illinois who are charged with enforcing its laws, including the challenged statute. Intervening defendant Heffernan is a licensed physician who has been granted leave to appear herein as guardian *ad litem* for those conceived but not yet born.

■ Defendant Scott asserts that he is not a proper party to this action. Although the Illinois statutes do not make the attorney general the chief prosecutor pursuant to the state's criminal statutes, the leading Illinois case clothes his office with the same authority as attorneys general at the common law. In Fergus v. Russel, 270 Ill. 304, 110 N.E. 130 (1915), the Illinois Supreme Court held that, although the state legislature may confer powers additional to those inherent in the common law office of attorney general, it may not deprive the office of any of its historical powers and duties as chief legal representative of the state.[4] The court further stated, "[A]t common law the Attorney General was the law officer of the crown and its chief representative in the courts."[5] Furthermore,

the attorney general has conceded that he is required to represent the people of the state before the supreme court in all matters in which their interests are apparent and to assist in the prosecution of any criminal trial when he believes the people's interest requires it.[6] Indeed, the overlap of the powers and duties of the state's attorneys of the several counties and the attorney general is such that it appears that, where their powers are concurrent, either officer may initiate appropriate proceedings in the name of the state if the other has not acted.[7] We hold, therefore, that the attorney general is a proper party defendant in this action.

■ Defendants challenge the standing of the plaintiffs to raise the claims which they assert. The female plaintiffs allege that the operation of the statute deprived them of their asserted right to terminate unwanted pregnancies in the state of their residence. They assert that they have been injured either by having been forced to bear unwanted children or by having to travel to foreign states to obtain abortions by qualified medical personnel. We have no doubt that, "On the basis of plaintiffs' substantive contentions, * * * there * * * exists a 'nexus between the status asserted by the [female plaintiffs] and the claim(s) (they present).'"[8] The standing requirements of Flast v. Cohen, 392 U.S. 83, 102, 88 S.Ct. 1942, 20 L.Ed. 2d 947 (1968), are thus satisfied by the litigative posture of the female plaintiffs. Moreover, the physician-plaintiffs have standing to raise the claims of their

3. On March 23, 1970, Poe moved for leave to intervene and for the issuance of a temporary restraining order enjoining the defendants from attempting to enforce the Illinois statute against Poe's physician for terminating her pregnancy. On March 27 Poe was allowed to intervene, but her request for a restraining order was denied. On March 30 the Court of Appeals for the Seventh Circuit issued the temporary restraining order requested by Poe.

4. 270 Ill. at 337–339, 110 N.E. at 143–144.

5. 270 Ill. at 336, 110 N.E. at 143.

6. Ill.Rev.Stat. ch. 14, § 4 (1969).

7. E. g., People ex rel. Kunstman v. Shinsaku Nagano, 389 Ill. 231, 59 N.E.2d 96 (1945); People ex rel. Miller v. Fullenwider, 329 Ill. 65, 160 N.E. 175 (1928). *But see* People v. Flynn, 375 Ill. 366, 368, 31 N.E.2d 591, 593 (1940).

8. Roe v. Wade, 314 F.Supp. 1217, 1220 (N.D.Tex.1970) (citing Flast v. Cohen, 392 U.S. 83, 102, 88 S.Ct. 1942, 20 L.Ed. 2d 947 (1968)).

patients even if we assume that no independent claim of theirs could withstand a motion for judgment on the pleadings.[9] All plaintiffs thus have standing to raise the claims which they assert.

## I

Plaintiffs contend that the Illinois abortion statute must be adjudged unconstitutionally vague. We agree. The statute prohibits all abortions except those "performed by a physician * * * in a licensed hospital or other licensed medical facility because *necessary for the preservation of the woman's life*." [10] Plaintiffs point to the italicized language as the basis for their assertion that the statute is invalid under the due process clause of the fourteenth amendment because of its imprecision. It is clear that, as the Supreme Court has said:

> No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids. * * * "[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its applica-

tion, violates the first essential of due process of law." [11]

The question thus becomes whether men of ordinary intelligence must guess at the meaning of the words, "necessary for the preservation of the woman's life."

We note at the outset that these words, or substantially identical ones, have convinced some courts that they are incapable of certain interpretation,[12] and other courts have disagreed.[13] If courts cannot agree on what is the essential meaning of "necessary for the preservation of the woman's life" and like words, we fail to see how those who may be subject to the statute's proscriptions can know what it prohibits. On the issue of vagueness, we are in agreement with the reasoning of People v. Belous [14] and Roe v. Wade.[15] One need not inquire in great depth as to the meaning of such words as "necessary" and "preserve" to conclude that the holdings of those cases are correct. "Necessary" has been characterized as vague by the United States Supreme Court [16] and has been similarly described by other courts.[17] It is "a word susceptible of various meanings. It may import absolute physical necessity or inevitability, or it may import that which is only convenient, useful, appropriate, proper, or conducive to the end sought." [18]

---

9. Griswold v. Connecticut, 381 U.S. 479, 481, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); Barrows v. Jackson, 346 U.S. 249, 257, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953).

10. Ill.Rev.Stat., ch. 38, § 23–1(b) (1969) (emphasis added).

11. Lanzetta v. New Jersey, 306 U.S. 451, 453, 59 S.Ct. 618, 619, 83 L.Ed. 888 (1939); *accord,* Jordan v. DeGeorge, 341 U.S. 223, 71 S.Ct. 703, 95 L.Ed. 886 (1951); Connally v. General Constr. Co., 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322 (1926).

12. *E. g.,* Roe v. Wade, 314 F.Supp. 1217, 1223 (N.D.Tex.1970); United States v. Vuitch, 305 F.Supp. 1032, 1034 (D.D.C. 1969); People v. Belous, 71 Cal.2d 954, 80 Cal.Rptr. 354, 458 P.2d 194, 197 (1969), cert. denied, 397 U.S. 915, 90 S.Ct. 920, 25 L.Ed.2d 96 (1970).

13. *E. g.,* Babbitz v. McCann, 310 F.Supp. 293, 298 (E.D.Wis.1970); Rosen v. Louisiana State Board of Medical Examiners, 318 F.Supp. 1217, (E.D.La.1970); Steinberg v. Rhodes, 321 F.Supp. 741 (N.D. Ohio, filed Dec. 18, 1970).

14. 71 Cal.2d 954, 80 Cal.Rptr. 354, 458 P.2d 194 (1969), cert. denied, 397 U.S. 915, 90 S.Ct. 920, 25 L.Ed.2d 96 (1970).

15. 314 F.Supp. 1217 (N.D.Tex.1970).

16. Yu Cong Eng v. Trinidad, 271 U.S. 500, 517–518, 46 S.Ct. 619, 70 L.Ed. 1059 (1926).

17. *E. g.,* Phillips v. Borough of Folcroft, 305 F.Supp. 766, 770–771 (E.D.Pa.1969); Westphal v. Westphal, 122 Cal.App. 379, 382, 10 P.2d 119, 120 (1932).

18. Black's Law Dictionary 1181 (4th ed. 1957).

The word "preserve" is similarly susceptible of so broad a range of connotations as to render its meaning in the statute gravely amorphous, since it may mean anything from maintaining something in its status quo to preventing the total destruction of something.[19] The treating physician who believes an abortion is medically or psychiatrically indicated thus finds himself threatened with becoming a felon as well as with the possibility of losing his right to practice his profession if he errs in the legal interpretation of a penal statute, the words of which have not been sufficiently definite for courts to agree on their meaning.[20] This is precisely the kind of situation that the void-for-vagueness doctrine is intended to prevent.

## II

■ Aside from the fact that the statute is vague, its practical effect is to make abortion unavailable to women unless there is a reasonable certainty that death will result from a continuation of pregnancy. This practical effect of the statute constitutes an intrusion on constitutionally protected areas too sweeping to be justified as necessary to accomplish any compelling state interest. These protected areas are women's rights to life, to control over their own bodies, and to freedom and privacy in matters relating to sex and procreation.

The Supreme Court has long recognized that a person possesses a fundamental, constitutionally protected right to privacy and freedom in certain personal and intimate matters, especially those pertaining to the home and family.[21] This right was developed and applied by the Supreme Court to strike down a state's birth control statute in Griswold v. Connecticut.[22] The Court there held that "specific guarantees in the Bill of Rights have penumbras, formed by emanations from those guarantees that help give them life and substance. * * * Various guarantees create zones of privacy."[23] Griswold set out in broad terms the right of married couples to be free from governmental intrusion into their intimate affairs:

We cannot distinguish the interests asserted by the plaintiffs in this case from those asserted in Griswold. In both, "[t]he essence of the interest sought to be protected * * * is the right of choice over events which, by their character and consequences, bear in a fundamental manner on the privacy of individuals."[24] It is as true after conception as before that "there is no topic more closely interwoven with the intimacy of the home and marriage than that which relates to the conception and bearing of progeny."[25] We believe that Griswold and related cases establish that matters pertaining to procreation, as

19. Webster's Third New International Dictionary 1794 (1961).

20. The problem faced by a treating physician in Illinois is as described in Roe v. Wade, 314 F.Supp. 1217, 1223 (N.D.Tex. 1970):

> How *likely* must death be? Must death be certain if the abortion is not performed? Is it enough that the woman could not undergo birth without an ascertainably higher possibility of death than would normally be the case? What if the woman threatened suicide if the abortion was not performed? How *imminent* must death be if the abortion is not performed? Is it sufficient if having the child will shorten the life of the woman by a number of years? These questions simply cannot be answered.

21. See, e. g., Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923); Pierce v. Society of Sisters, 268 U.S. 510, 534, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); Prince v. Massachusetts, 321 U.S. 158, 166, 64 S.Ct. 438, 88 L.Ed. 645 (1944); Loving v. Virginia, 388 U.S. 1, 12, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); and Stanley v. Georgia, 394 U.S. 557, 564, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969).

22. 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965).

23. Id. at 484, 85 S.Ct. at 1681.

24. Roe v. Wade, 314 F.Supp. 1217, 1221 (N.D.Tex.1970).

25. Babbitz v. McCann, 310 F.Supp. 293, 299 (E.D.Wis.1970).

well as to marriage, the family, and sex are surrounded by a zone of privacy which protects activities concerning such matters from unjustified governmental intrusion.[26]

We do not agree with the defendants that the choice whether to have a child is protected before conception but is not so protected immediately after conception has occurred.[27] A woman's interest in privacy and in control over her body is just as seriously interfered with by a law which prohibits abortions as it is by a law which prohibits the use of contraceptives. The majority of courts which have considered the question have so held, concluding that a woman has a fundamental interest in choosing to terminate a pregnancy. In People v. Belous, *supra*, the California Supreme Court struck down that state's abortion statute, holding:

The fundamental right of the woman to choose whether to bear children follows from the Supreme Court's and this court's repeated acknowledgment of a "right of privacy" or "liberty" in matters related to marriage, family, and sex.[28]

In United States v. Vuitch, *supra*, a single district court judge struck down a portion of the District of Columbia abortion statute, saying:

There has been, moreover, an increasing indication in decisions of the Supreme Court of the United States that as a secular matter a woman's liberty and right of privacy extends to family, marriage and sex matters and may well include the right to remove an unwanted child at least in early stages of pregnancy. * * * Matters have certainly reached a point where a sound, informed interest of the state must affirmatively appear before the state infringes unduly on such rights.[29]

More recently, in Babbitz v. McCann,[30] and in Roe v. Wade, [31] three-judge courts found that the right to choose whether to bear a child was fundamental and struck down state abortion statutes.

■ Of course, the determination that women have a fundamental interest in choosing whether to terminate pregnancies does not establish that the Illinois statute is unconstitutional. The critical issue is whether the state has a compelling interest in preventing abortions in the early stages of pregnancy except where the death of the woman is reasonably certain.[32] A stat-

26. As former Supreme Court Justice Tom C. Clark has said:
   The result of [Griswold and its predecessors] is the evolution of the concept that there is a certain zone of individual privacy which is protected by the Constitution. Unless the State has a compelling subordinating interest that outweighs the individual rights of human beings, it may not interfere with a person's marriage, home, children, and day-to-day living habits. This is one of the most fundamental concepts that the Founding Fathers had in mind when they drafted the' Constitution.
   Clark, Religion, Morality, and Abortion: A Constitutional Appraisal, 2 Loyola Univ. (L.A.) L.Rev. 1, 8 (1969).

27. Again, Mr. Justice Clark observed:
   [A]bortion falls within that sensitive area of privacy—the marital relation. One of the basic values of this privacy is birth control, as evidenced by the *Griswold* decision. Griswold's act was to prevent formation of the fetus.

This, the Court found, was constitutionally protected. If an individual may prevent conception, why can he not nullify that conception when prevention has failed?
*Id.* at 9.

28. 71 Cal.2d 954, 963, 80 Cal.Rptr. 354, 359, 458 P.2d 194, 199 (1969), cert. denied, 397 U.S. 915, 90 S.Ct. 920, 25 L.Ed.2d 96 (1970).

29. 305 F.Supp. 1032, 1035 (D.D.C.1969).

30. 310 F.Supp. 293 (E.D.Wis.1970).

31. 314 F.Supp. 1217 (N.D.Tex.1970).

32. As the court stated in Roe v. Wade, 314 F.Supp. 1217, 1222 (N.D.Tex.1970):
   Since the Texas Abortion Laws infringe upon plaintiffs' fundamental right to choose whether to have children, the burden is on the defendant to demonstrate to the satisfaction of the Court that such infringement is necessary to support a compelling state interest.

ute which requires a woman to risk physical and emotional harm short of death when a therapeutic abortion would remove that risk does not bear scrutiny as a health measure for the benefit of women.

█ Moreover, a statute which forces the birth of every fetus, no matter how defective or how intensely unwanted by its future parents, displays no legitimately compelling state interest in fetal life, especially when viewed with regard for the countervailing rights of pregnant women. We do not believe that the state has a compelling interest in preserving all fetal life which justifies the gross intrusion on a woman's privacy which is involved in forcing her to bear an unwanted child. We therefore rule that during the early stages of pregnancy—at least during the first trimester—the state may not prohibit, restrict or otherwise limit women's access to abortion procedures performed by licensed physicians operating in licensed facilities.

In holding that the state has not shown sufficient justification to permit us to uphold its abortion statute in its entirety, we are in agreement with the court's statement in Babbitz v. McCann:

> The defendants urge that the state's interest in protecting the embryo is a sufficient basis to sustain the statute. Upon a balancing of the relevant interests, we hold that a woman's right to refuse to carry an embryo during the early months of pregnancy may not be invaded by the state without a more compelling public necessity than is reflected in the statute in question.[33]

Accordingly, the Illinois abortion statute, Illinois Revised Statutes, Chapter 38, Section 23–1, is unconstitutional because it is impermissibly vague and unduly infringes women's right to privacy insofar as it restricts or prohibits the performance of abortions during the first trimester of pregnancy by licensed physicians in a licensed hospital or other licensed medical facility.

### ORDER

1. The foregoing opinion shall stand as findings of fact and conclusions of law.

2. The motion of plaintiffs for summary judgment is hereby granted, and the motion of defendants for summary judgment is hereby denied.

3. The motion of defendant Scott to dismiss this action as against him is hereby denied.

4. All other motions presently outstanding are hereby denied to the extent not expressly granted herein or mooted by or subsumed in the foregoing opinion or this order.

It is therefore ordered, adjudged and decreed:

1. That the Illinois abortion statute, Illinois Revised Statutes, Chapter 38, Section 23–1, be and the same is hereby declared to be violative of the Constitution of the United States and is null and void insofar as it restricts or prohibits the performance of abortions during the first trimester of pregnancy by licensed physicians in a licensed hospital or other licensed medical facility.

2. That the defendants, their officers, agents, servants, employees, and attorneys, and those persons who act in active concert or participation with them be and the same are hereby permanently enjoined, without bond, from executing or enforcing, or threatening to execute or enforce, the Illinois abortion statute, Illinois Revised Statutes, Chapter 38, Section 23–1 against physicians licensed to practice medicine and surgery in all its branches performing abortions during the first trimester of pregnancy in a licensed hospital or other licensed medical facility.

*See also* Bates v. Little Rock, 361 U.S. 516, 524, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960); Griswold v. Connecticut, 381 U.S. 479, 497, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (Goldberg, J., concurring).

33. 310 F.Supp. 293, 301 (E.D.Wis.1970).

CAMPBELL, Senior Judge (dissenting).

The typically erudite opinion of our distinguished Chief Judge Swygert excellently presents some philosophical reasons for amendment to or repeal of the existing abortion statute by the Illinois Legislature. I must respectfully disagree however when these reasons are advanced to support a judicial determination that the statute "is unconstitutional because it is impermissibly vague and unduly infringes women's right to privacy." Neither the wisdom of this statute nor its conformity to the accepted mores of Illinois in 1971 is the issue before us. As a federal court we are concerned only with the limited question of whether in enacting this statute the people of Illinois have exceeded the limitations of the United States Constitution.

By their foregoing decision and order in this case concluding that those limits have been exceeded, my learned brothers strike down a state statute which has been enforced for one hundred years [1] and impose upon the people of Illinois their own views on this most important and controversial issue concerning public health and morals. In my view this unwarranted intrusion by the federal judiciary into the affairs of Illinois in the name of constitutional interpretation is far beyond properly limited federal powers and is not supported by the facts of this case nor the precedents cited by my brethren.

The basis of the majority decision is twofold: (1) the Illinois statute (and particularly the exception found therein) is so vague as to render it unconstitutional; and (2) by prohibiting the destruction of fetal life the statute invades the privacy of the women and the family entities of Illinois.

On the vagueness question I first observe that we have before us no contention by any party that an actual situation exists where a licensed physician acting in good faith is in jeopardy of prosecution for performing an abortion he believed to be "necessary for the preservation of the woman's life." In other words we are presented with no actual circumstance where the vagueness question is in issue. The rather forced game of semantics urged by plaintiffs and adopted by the majority has not presented any *actual* controversy but is merely a convenient vehicle for these plaintiffs to challenge a law which they believe is unwise and which they have thus far despite heroic efforts been unable to repeal or amend by the legislative process.[2]

A perusal of state and federal criminal codes reveals numerous examples of statutes which have been held constitutional and which are not as clear and definite as this one. Indeed Chief Judge Swygert, in writing his court's opinion upholding the constitutionality of the Illinois disorderly conduct statute, found that the language of that statute prohibiting any act done in "such unreasonable manner as to alarm or disturb another" was not unconstitutionally vague. As stated by him in that opinion: "The Constitution does not require impossible standards of specificity in penal statutes. It requires only that the statute convey 'sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices.'" United States v. Woodard, 376 F.2d 136, 140 (7th Cir. 1967).

His opinion goes on to state, "The statute proscribes conduct that is so unreasonable as to 'alarm or disturb' another and provoke a 'breach of the peace'. The term 'breach of the peace' has never had a precise meaning in relation to specific conduct. Yet from its early common law origin to the present it has received a fairly well defined gloss." (Id. at 141). In our case, how-

---

1. The present statute is essentially the same as that enacted in 1874. (R.S. 1874, Ch. 38, Div. 1, § 3.)

2. Attempts to amend or repeal the present statute failed in the last (1969) session of the General Assembly. New proposals have already been introduced in the present (1971) session.

ever, the same judge concludes that men and women of ordinary intelligence cannot understand the essential meaning of the words, "necessary for the preservation of the woman's life." I find it difficult to reconcile the reasoning in the *Woodard* case with that set forth in the opinion of the majority herein.

The words of the Illinois Abortion Statute taken in their ordinary meaning sufficiently convey definite warning as to the proscribed conduct and "have over a long period of years proved entirely adequate to inform the public, including both lay and professional people, of what is forbidden." Steinberg v. Rhodes, 321 F.Supp. 741, 745 (N.D.Ohio, 1970); Babbitz v. McCann, 310 F.Supp. 293, 297 (E. D.Wis.1970). The statement of the court in the *Steinberg* opinion is appropriate here:—"The problem of the plaintiffs is not that they do not understand, but that basically they do not accept, its proscription." 321 F.Supp. at p. 745.

I find the second conclusion of the majority, that the statute is not supported by a sufficient legitimate state interest, even more disconcerting. As the majority correctly points out, the determination that women have a fundamental interest in choosing whether to terminate pregnancies does not in and of itself establish that the Illinois statute is unconstitutional. The critical issue is whether the state has a sufficient interest in preventing abortion to justify its prohibition. My brothers conclude that the State of Illinois does not have a sufficient interest in preserving fetal life to support the statute before us, when the same is viewed with regard for countervailing rights to terminate pregnancies. It is at this juncture that I again part company with my brothers.

We, as did the Illinois Legislature, have before us the following undisputed facts relating to fetal life. Seven weeks after conception the fertilized egg develops into a well proportioned small scale baby. It bears all of the familiar external features and all the internal organs of an adult human being. It has muscles; hands with fingers and thumbs; and the legs have recognizable knees, ankles and toes.

The brain is operative and sends out impulses that coordinate the function of the other organs. Brain waves have been noted at 43 days. The heart beats; the stomach produces digestive juices; the liver manufactures blood cells; and the kidneys begin to function by extracting uric acid from the blood.

In the third month it can kick its legs, turn its feet, curl and fan its toes, make a fist, move its thumb, bend its wrist, turn its head, and even open its mouth and swallow and drink the amniotic fluid that surrounds it. Thumb sucking has been noted at this age and the first respiratory motions move fluid in and out of its lungs with inhaling and exhaling respiratory movements.

In the twelfth week it can move its thumb, in opposition to its fingers. It swallows regularly. It has active reflexes. The facial expressions of a fetus in its third month are already similar to the facial expression of its parents. By the end of that first trimester the fetus is a sentient moving being.

In the third month finger nails appear; sexual differentiation is apparent in both internal and external organs; and vocal chords are completed.

From the twelfth to the sixteenth week the child grows to eight or ten inches in height and receives oxygen and food from its mother through the placental attachment. In the fifth month it gains two inches in height and ten ounces in weight. A doctor will soon hear the heart beat with his stethoscope. It sleeps and wakes and may be awakened by external vibrations.

In the sixth month the fetus develops a strong muscular grip with its hands; starts to breathe regularly and can maintain a respiratory response for twenty-four hours if born prematurely. It may even have a slim chance of surviving in an incubator. A child has been known to survive between twenty to twenty-five weeks old. Indeed, as medical science progresses in the field of de-

tection the date of potential viability moves continually closer to earlier stages of gestation.

Dr. Arnold Gesell, in his publication. *"The Embryology of Behavior*,[3] notes:—

"Our own repeated observation of a large group of fetal infants (an individual born and living at any time prior to forty weeks gestation) left us with no doubt that psychologically they were individuals. Just as no two looked alike, so no two behaved precisely alike. One was impassive when another was alert. Even among the youngest there were discernible differences in vividness, reactivity and responsiveness. These were genuine individual differences, already prophetic of the diversity which distinguishes the human family."

Similar facts of fetal life are discussed in detail in a recently published Law Review article, Byrn, Abortion-On-Demand: Whose Morality? 46 N.D. Law. 5 (1970). Professor Byrn concludes:—

"In summary: at eight weeks, after which the great majority of abortions are performed, the fetus is irreversibly organized into a recognizable human-child, is responsive to stimulation, and is possessed of a pumping heart, a functioning circulatory system, an active brain and all other internal organs. From the practical scientific point of view, 'By the eighth week the embryo or fetus, as we now call it, is an unmistakable human being * * *'."

This author also points out that abortion is a violent procedure regardless of the stage of pregnancy. Byrn, Supra, p. 32.

Professor Byrn also relates (at pp. 8–9) the following experience of Paul E. Rockwell, M.D., Director of Anesthesiology at Leonard Hospital, Troy, New York:

"Eleven years ago while giving an anesthetic for a ruptured ectopic pregnancy (at two months gestation) I was handed what I believe was the smallest living human being ever seen. The embryo sac was intact and transparent. Within the sac was a tiny (approx. 1 cm.) human male swimming extremely vigorously in the amniotic fluid, while attached to the wall by the umbilical cord. This tiny human was perfectly developed, with long, tapering fingers, feet and toes. It was almost transparent, as regards the skin, and the delicate arteries and veins were prominent to the ends of the fingers.

"The baby was extremely alive and swam about the sac approximately one time per second, with a natural swimmer's stroke. This tiny human did not look at all like the photos and drawings and models of 'embryos' which I have seen, nor did it look like a few embryos I have been able to observe since then, obviously because this one was alive!

" * * * When the sac was opened, the tiny human immediately lost its life and took on the appearance of what is accepted as the appearance of an embryo at this age (blunt extremities, etc.)

"It is my opinion that if the lawmakers and people realized that very vigorous life is present, it is possible that abortion would be found much more objectionable than euthanasia."

In my opinion the undisputed medical facts of record herein establish a sufficient state interest in the preservation of life to support the constitutionality of the statute before us.

The majority opinion does not hold that the Illinois Statute is void in its entirety or that every statute that prohibits the destruction of fetal life is unconstitutional. Rather, it seems to hold that the people of this State have a legitimate legislative interest in protecting *some* fetal life, but that the present statute which protects, "every fetus, no matter

---

3. Harper and Brothers, Publishers (1945), at p. 172.

how defective or how intensely unwanted by its future parents, displays no legitimately compelling state interest." I believe what the majority is suggesting is that if the Illinois Legislature had adopted a statute which, while prohibiting abortions generally, permitted the destruction of the "defective" fetus or one that is "intensely unwanted" it would have displayed a legitimate state interest. It seems to me apparent, however, that if the legislature has the power to decide that a *non defective* fetus may not be destroyed, it can also decide that a *defective* fetus may not be destroyed. How much latitude shall judicially be given the legislature in its determination as to what is and what is not a sufficient "defect" to warrant destruction? How unwanted must a potential child be before its parents can demand destruction under the suggested judicial "intensely unwanted" standard? Merely stating these propositions illustrates the extent to which my brothers have wandered into the legislative domain in reaching their decision in this case.

But the majority does not rest its conclusion of unconstitutionality on such a tenuous base. Instead, the majority states: "We therefore rule that during the early stages of pregnancy—at least during the first trimester—the state may not prohibit, restrict or otherwise limit women's access to abortion procedures * * *" The opinion does not explain or even intimate how it arrived at this constitutional conclusion. It appears to me that my brothers have, by judicial fiat, successfully amended the Illinois statute to permit abortions in the first three months of pregnancy. Ironically, their amendment does not even meet sound legislative standards. Nowhere do they explain how the "first trimester" test was arrived at, or what relationship it might have to the previously discussed notions of defectiveness or unwantedness. What rational basis supports their conclusion that the people of Illinois may have a sufficient interest in protecting the life of a fetus which has matured to the first trimester, but that no legitimate interest exists for protecting a life of a fetus a few days younger? I believe the Illinois Legislature, in adopting the present statute, was less arbitrary even if not as competent as my brothers on these social and moral matters. In my opinion, however, the legislature alone should determine what value society will place on this form of life, regardless of the age of development.

Thus far I have avoided any discussion of the sensitive subject of whether fetal life is "human" life. Admittedly physicians argue as to what point in the fetal development human life commences. As former Supreme Court Justice Tom C. Clark states in the Law Review article quoted by the majority, "Some physicians argue that abortion should be permitted with impunity at any time up to the sixth month of pregnancy since prior to that time the fetus is no more than a growing plant. On the other hand, many eminent physicians believe that the fertilized ovum has human life from the time of conception. In support of this argument they refer to the International Code of Medical Ethics, which states that a physician will maintain the utmost respect for human life, from the time of its conception." Clark, Religion, Morality and Abortion: A Constitutional Appraisal, 2 Loy.U.L.Rev. 1, 5 (1969). Assuming *arguendo* that fetal life is human life, can there be any question but that the State of Illinois has a sufficient legislative interest in its protection? And, in view of the varied opinions in medical science, is not the determination of when human life commences better left to the legislature, rather than the courts? This was the conclusion reached by Mr. Justice Clark in the above quoted article. Significantly, while liberally quoting Justice Clark's article on the subject of abortion (see notes 26 and 27), the majority conveniently ignores its conclusion and admonition as follows:—

"Accommodation of conflicting doctrine is more difficult to achieve in

the judicial than in the legislative process. Courts cannot reach out to reform our society. A problem comes to the Court in the form of a justiciable issue and is narrowly drawn, rendering the Court's ruling contracted and finespun. Legislatures, on the other hand, have such facilities for investigation as hearings and may address themselves to the necessities of broad social needs and the correction of evils, both probable and existing. As Mr. Justice Cardozo said, 'Legislation can eradicate a cancer, right some hoary wrong, correct some definitely established evil, which defies the feebler remedies, the distinctions and the fictions familiar to the judicial process.'

"The courts work on a case-by-case system which deals with the past rather than the future. Society would not have the benefit of the sweeping effect of a statute, nor would the doctor have the protection that he is entitled to receive. The case method would be slow, expensive, and possibly disastrous. It is for the legislature to determine the proper balance, i. e., that point between prevention of conception and viability of the fetus which would give the State the compelling subordinating interest so that it may regulate or prohibit abortion without violating the individual's constitutionally protected rights." (At pp. 10–11).

To support their conclusion that the people of Illinois have exceeded the proper bounds of legislative interest, the majority primarily rely on the rationale of the Supreme Court in Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510. But *Griswold* held only that a statute which forbade the use of contraceptives by married couples violated their right to privacy. In writing the opinion of the Court, Mr. Justice Douglas indicated that the Connecticut statute was "unnecessarily broad" and prevented activities which might otherwise be subject to state regulation. (381 U.S. 485, 85 S.Ct. 1678). The more

thorough concurring opinion, written by Mr. Justice Goldberg, stressed that there was in that case no showing that the statute was necessary to accomplish a permissible state interest.

In this case, however, there is in my opinion a valid and permissible state interest—the protection of human life or at least the protection of potential human life in the fetus. In my opinion the statute in question is no broader than is necessary to accomplish this valid and permissible state interest even though it does not distinguish or provide exceptions, as my brothers would prefer, for those which are "defective" or "intensely unwanted," or have not matured to "the first trimester of pregnancy."

In citing *Griswold*, the majority concludes: "we cannot distinguish the interests asserted by the plaintiffs in this case from those asserted in *Griswold*." In other words, in their views, there is no distinction that can be made between prohibiting the use of contraceptives and prohibiting the destruction of fetal life, which as explained above may reasonably be construed to be human life. I find this assertion incredible. Contraception prevents the creation of new life. Abortion destroys existing life. Contraception and abortion are as distinguishable as thoughts or dreams are distinguishable from reality.

As for myself I am confronted with and bound by the plain facts before us in this case and I must conclude that the people of Illinois have a legitimate and sufficient interest in protecting fetal life to support the statute here considered. I find nothing in the Court's teachings in *Griswold* to the contrary.

No individual right or freedom is ever advanced in this country through an unwarranted intrusion of the judiciary into the proper province of the legislature. Indeed, in these days of pressure groups regularly seeking from courts that which only legislatures can properly give, constitutional government is weakened each time courts place their personal philosophical views above the law.

I would grant the motion of defendants for summary judgment and leave the plaintiffs' cause where under the Constitution it belongs—in the Illinois Legislature.