SECURITIES INVESTMENT COMPANY OF ST. LOUIS, APPELLANT, *v.* J. A. DONNELLEY AND HAROLD V. CLARK, AS COEXECUTORS OF THE ESTATE OF WILBUR I. CLARK, DECEASED, RESPONDENTS.

No. 6848

September 7, 1973                    513 P.2d 1238

*George Rudiak,* of Las Vegas, for Appellant.

*Foley Brothers,* of Las Vegas, for Respondents.

## OPINION

By the Court, BATJER, J.:

Wilbur I. Clark died on or about the 27th day of August, 1965, and the respondents were appointed and qualified as co-executors of his estate. At the time of his death, Wilbur Clark was engaged in a number of hotel enterprises including the development of a 310 room hotel in Austin, Texas, known as "Wilbur Clark's Crest Hotel." That hotel was being constructed by W. C. Austin, Inc., a corporation in which the decedent was a principal stockholder at the time of his death. The hotel was to have been operated under a lease to which the decedent was one of the participating lessees.

To place the hotel in an operating condition, it was necessary to install certain kitchen equipment, the installation of which resulted in appellant's claim. On September 23, 1965, the co-executors of Wilbur Clark's estate petitioned the district court for authority to continue operating the businesses of the decedent. In that petition the particular facts relating to the Austin, Texas hotel were set forth. On the same day they obtained an order from the district court expressly authorizing them to continue the operation of the business of the decedent and "to perform all acts, execute any and all documents, whether they be in the nature of promissory notes, trust deeds, continuing guaranties, leases, chattel mortgages, security agreements pertaining to the enumerated projects in the petition, so as to insure the continuity of said business." On January 25, 1966, the co-executors executed a limited guaranty agreement guaranteeing a promissory note in the amount of $138,287.60, in which W. C. Austin, Inc., appears as maker, and the appellant as payee. This limited guaranty agreement ran in favor of D. E. C. Associates, Inc., and was for the purpose of inducing D. E. C. Associates to endorse the note.

The proceeds of the note made by W. C. Austin, Inc., went to that corporation and were never delivered to the Wilbur Clark estate. W. C. Austin, Inc., defaulted and a foreclosure took place, resulting in a deficiency of $119,785.86, plus interest and certain court costs awarded by the Texas trial court.

The appellant demanded payment of the deficiency from D. E. C. Associates, Inc., as endorser of the note, and D. E. C. Associates in turn demanded payment from the co-executors of the Wilbur Clark estate under the limited guaranty agreement. D. E. C. Associates then assigned its claim under the limited guaranty agreement to appellant, which brought its verified petition in the Wilbur Clark estate requesting that this debt be treated as an expense of administration.

The district court found that the appellant's deficiency claim was not entitled to priority as a cost of administration and denied the petition. An appeal from the order was taken and in Securities Investment Co. v. Donnelley, 84 Nev. 457, 443 P.2d 551 (1968), we held that appeal to be premature and remanded the cause for further proceedings to allow the district court to determine the validity of Securities Investment Company's claim. After remand several hearings were held and the district court on June 24, 1971, ordered, subject in part to the prior decision of that court entered on September 12, 1967,[2] that the deficiency claim of appellant in the amount of $119,-785.86, together with interest and $199.85 in costs be allowed. No award of requested attorney fees was made.

The appellant now contends that the trial court erred in (1) refusing to adjudicate the claim of the appellant as an expense of administration with priority over the ante-mortem debts of the decedent; (2) refusing to award attorney fees, and (3) disallowing costs.

1.  The claim of the appellant, which is upon an assignment of a claim secured by a continuing guarantee executed by the respondents under the order of the district court to secure the purchase of an improvement, i.e. kitchen equipment for a hotel which was the asset of a corporation in which the decedent held stock, can not properly be classed as a necessary expense

___

[2]On September 12, 1967, John C. Mowbray, then a district court judge, filed his Decision, in which he held:

"In the opinion of this Court the loan which is the subject of the pending petition should not be entitled to priority over the ante-mortem debts of decedent and should be held to be a charge against the estate rather than an expense of administration.

"THEREFORE, IT IS ORDERED that the petition of Securities Investment Company of St. Louis for an order directing the Co-Executors to pay its claim forthwith as an expense of administration be, and it is hereby denied."

of administration either under NRS 143.050[3] authorizing the making of such an order nor under NRS 150.230 which allows the executor or administrator to retain within his control the necessary expenses of administration. NRS 143.050 does not specifically provide for a preference and cannot be so construed. The effect of NRS 143.050 is to make claims such as the one presented here a charge against the estate rather than the co-administrators but no preference is created.

Equality in treatment of creditors of estates is the general rule. Any intent of a legislature to accord a preferential status must be clearly expressed. In Re Andrew's Estate, 40 N.Y.S.2d 81 (Sur.Ct. 1942); In Re Stewart's Will, 109 N.Y.S.2d 609 (Sur.Ct. 1951). The appellant has cited no statutes of this state which could be construed to give this debt a preference.

In In Re Allen's Estate, 108 P.2d 973 (Cal.App. 1941). the administratrix in compliance with a court order entered pursuant to a statute very similar to NRS 143.050, continued to operate a distributing business for dairy products. There the appellate court held that goods sold on credit to enable the business to continue could not be classed as an expense of administration because the statutory authority did not provide for such a preference and should not be so construed.

We have discovered no authority and none has been cited which would allow the cost of an improvement to an estate as an expense of administration or as a debt with a priority of payment ahead of the general creditors.[4] In two California

[3]Historically the identical language found in NRS 143.050 was enacted in the Statutes of California, 1929, p. 157, sec. 1, as an amendment to the California Code of Civil Procedure, Sec. 1581. In the Statutes of California, 1931, p. 587 et seq. (approved May 11, 1931; effective August 14, 1931), certain of the California Civil Code and the California Code of Civil Procedure, pertaining to the probate of the estates of decedents were repealed and a Probate Code (of California) was enacted. The amendment to sec. 1581 (the second sentence) was reenacted as sec. 572 of the Probate Code (of California). The exact wording of sec. 1581 of the California Code of Civil Procedure was enacted as sec. 164 of the Statutes of Nevada, 1897, and later codified as sec. 9764 NCL 1929. The present language of NRS 143.050 was first enacted in this State on March 26, 1941 and is found in Statutes of Nevada, 1941, p. 163, and later codified as sec. 9882.195, 1929 NCL 1931–41 Supplement.

[4]Cf. Nathan v. Lehman Abraham & Co., 39 Ark. 256 (1882), where money advanced to the administrator to improve the real estate and protect it against an attachment suit was held to be an expense of administration.

cases decided long before that state enacted legislation similar to NRS 143.050, it was held that new construction performed on estate property during the course of administration could not properly be classified as a cost of administration. In In Re Moore, 13 P. 880 (Cal. 1887), an administrator had expended moneys of the estate in the erection of a new building upon property belonging to the decedent and claimed reimbursement. The appellate court held that the trial court erred in allowing that claim, stating: "This money was not expended in the care and management of the estate. It was the duty of the administrator to administer and turn over the estate as soon as possible, and not to speculate with it, or carry on business on its account, or to improve it for the benefit of the heirs." 13 P. at 884.

In the Matter of Hincheon's Estate, 116 P. 47 (Cal. 1911), that court said: "While it is the duty of executors to perform valid and uncompleted contracts which have been entered into by their testator, they are not called on, nor have they the right to expend the funds of the estate for the doing of new work which the testator himself was not bound to do." There is nothing in this record nor is there even a hint or suggestion that the loan money was used to perform valid and uncompleted contracts which had been entered into by the testator in his individual capacity. See also In Re Thurber's Estate, 142 N.E. 493 (Ill. 1924) and In Re Allen's Estate, supra.

In support of its position the appellant relies upon In Re Estate of Sharp, 95 Cal.Rptr., 816 (Cal.App. 1971), Quigley v. Nash, 36 P.2d 112 (Cal. 1934), and In Re Donnelly's Estate, 92 A. 306 (Pa. 1914). Each can be clearly distinguishable from the case at bar. Those cases hold that expenses of preserving the property of an estate are entitled to a priority of payment before general creditors are paid. In Perez v. Gil's Estate, 222 P. 907 (N.M. 1924), also relied upon by the appellant, the trial court specifically found that certain groceries and supplies furnished by the appellee to the co-administrators to carry on a sheep raising business, were expenses of administration necessary to preserve and protect the assets of that estate.

The word "preserve"[5] is susceptible to a broad range of connotations from maintaining something in its status quo to

---

[5]In Webster's Third New International Dictionary, p. 1794 (1968), the definition to preserve is: "To keep safe from injury, harm or destruction; guard or defend from evil; protect, save." In Webster's Second New International Dictionary, p. 1956 (1952), the definition to

preventing its total destruction. It implies the continuance of what previously existed. In none of its uses does it connote creating something new or extending an existing thing or status. The purchase of kitchen equipment for "Wilbur Clark's Crest Hotel" is not conceivable within the range of the meaning of the words "preserve" or "protect."

Here the action of the co-executor was not in the nature of preserving or protecting an asset as contended by the appellant, but was in reality an attempt to put the hotel into an operating position. It amounted to speculation which proved to be costly.

It was held in In Re Smith's Estate, 60 P.2d 574 (Cal.App. 1936),[6] that a bank which had loaned money to the estate of the decedent on unsecured notes signed in the name of the estate by the executors, as authorized by the will and an order of the court, to enable the executors to carry on the ranch operations of the estate, had a valid claim against the estate for the amount of the loan but such claim was not entitled to any priority over the general debts and obligations of that estate. That court said: "It follows that the unsecured indebtedness of the appellant should be classified . . . as an ordinary debt or obligation of the estate, and not as current expenses of administration exactly the same as though the loan had been made to the decedent for the same purpose before her death. To hold otherwise would defeat the very spirit and purpose of the probate law which seeks to distribute the property of an estate to the heirs, legatees, and creditors of the decedent

preserve is: "To protect or save, to keep or save from injury or destruction. To maintain." Cf. Doe v. Scott, 321 F.Supp. 1385 (N.D. Ill. 1971); Concrete, Inc. v. Rheaume Builders, 132 A.2d 133 (N.H. 1957); City of Cincinnati v. Wright, 67 N.E.2d 358, 361 (Ohio App. 1945); McKeon v. Central Stamping Co., 264 F. 385, 387 (3rd Cir. 1920).

[6]The Nevada legislature enacted the statute which is presently NRS 143.050 as the second paragraph of NCL 9882.125 (adopted from the statutes of the State of California (see footnote 3, supra)), several years after In Re Smith's Estate, supra, and In Re Allen's Estate, supra, had been decided. When a legislature patterns a statute upon a law of another state, the courts of the adopting state usually follow the construction placed on the statute in the jurisdiction of its inception. However, in Stocks v. Stocks, 64 Nev. 431, 183 P.2d 617 (1947), we said, in treating the language of a venue statute as mandatory rather than discretionary: "This court has never held that the rule of statutory construction, whereunder the interpretation by the highest court of a sister state, of a statute of that state copied by us, is strongly persuasive, is absolutely controlling." 64 Nev. at 437, 183 P.2d at 620. See Thran v. District Court, 79 Nev. 176, 380 P.2d 297 (1963); Nootenboom v. State, 82 Nev. 329, 418 P.2d 490 (1966); Sutherland, Statutory Construction § 5209.

as speedily and in as unimpaired a condition as possible. The appellant's construction of this statute would enable the representatives of an estate to speculate on the success of a questionable enterprise in conducting a farm or for various other purposes at the expense of those who are entitled to the property and perchance thereby destroy the security of established debts and valid claims by creating new and subsequent obligations which would supersede the former ones as preferred claims. This would be a dangerous power to confer upon the representatives of an estate, and we are of the opinion the Legislature wisely refrained from doing so. That procedure would be unfair and unjust to the heirs, legatees, and creditors of the estate, and in the absence of clear statutory provisions to that effect we must assume it is not the law." 60 P.2d at 576.

The appellant also argues: "Furthermore, since no creditor appeared in the court below to object the granting of the appellant's petition it would seem completely inconsistent for the co-executors who had initially induced the [c]ourt to authorize the continuing guaranty . . . , to now take the position that the [o]rders of the lower [c]ourt were not reasonably necessary to preserve and maintain the assets of the [e]state."

The appellant has ignored the facts as well as the time sequence surrounding the entry of the order in question. The Petition for Authority to Continue Operation of Business was filed at 3:40 p.m. on September 23, 1965, the Order Authorizing Co-executors to Continue Operation of Business was signed by the district judge and filed two minutes later at 3:42 p.m., on September 23, 1965. It recited that "[A]fter examining the petition and evidence having been heard and it appearing the primary beneficiaries and/or distributees under the will of the decedent have filed their written approval of said petition and any order this court may issue predicated thereon and therefore notice of hearing is unnecessary and should be dispensed with. . . ." The statutory provisions (NRS 149.020(2)) in effect at the time of the entry of that order required the clerk of the court to set the petition for hearing and give notice thereof for the period and in the manner required by statute or in the alternative to give such notice as the court by order may require. Nowhere may it be found that the court had the authority to order that "notice of hearing is unnecessary and should be dispensed with." It is apparent that at that point in time no consideration was given to the ante-mortem creditors.

2. We turn now to consider whether the district court erred in denying the appellant attorney fees. An examination of the

Limited Guaranty[7] reveals that the legal and other costs and expenses for which the guarantors promised to pay are costs of collection. The provision for the payment of legal costs relates only to proceedings to collect the note. This action is upon the guaranty. The signers of guaranty agreements are not liable for attorney fees incurred in suits to enforce such agreements in the absence of an express provision for such liability.[8] Here the Limited Guaranty does not contain an express provision for the payment of attorney fees to enforce it. The district court did not err in refusing to allow the appellant attorney fees.[9] D. W. Jaquays & Co. v. First Security Bank, 419 P.2d 85 (Ariz. 1966); George Moroy Cigar & Tobacco Co. v. Henriques, 184 So. 403 (La.App. 1938). See also Cooke v. Mesmer, 128 P. 917 (Cal. 1912); Abbot v. Brown, 22 N.E. 813 (Ill. 1889); Blume v. National Homes Corporation, 441 S.W.2d 176 (Tex. 1969); Schauer v. Morgan, 216 P. 347 (Mont. 1923); 38 Corpus Juris Secundum, Guaranty § 58.

3. The appellant's claim that the district court erred in its judgment of June 24, 1971, and in its order of October 5, 1971, granting respondents' motion to retax costs. This contention is not well taken. Its memorandum of costs and disbursements was filed more than five days after it had served its notice of entry of order upon the co-executors. The statutory provision, NRS 18.110(1), requires the prevailing party to serve a copy of his costs upon the adverse party within five (5) days after the notice of the entry of order or judgment.[10]

---

[7]Limited Guaranty reads in pertinent part:

"Paragraph I: . . . the undersigned . . . hereby unconditionally guarantee . . . that the Obligor will promptly and punctually perform . . . that all sums . . . will be promptly paid in full . . . *together with any and all legal and other costs and expenses paid or incurred in connection therewith.* (Emphasis added.)

"Paragraph II: The liability of the undersigned hereunder may be enforced directly against the undersigned, and each of them, independently of and without proceeding against the Obligor. . . ."

[8]NRS 18.010(3) is not controlling in this case.

[9]Cf. Wiener v. Van Winkle, 78 Cal.Rptr. 761 (Cal.App. 1969), a case cited by the appellant, where the guaranty agreement read: "25. I agree to pay without demand reasonable attorney's fees and all costs . . . or in enforcing this Guaranty against me or any other guarantor."

[10]NRS 18.110(1): "The party in whose favor judgment is rendered, and who claims his costs, must deliver to the clerk, and serve a copy upon the adverse party, within 5 days after the verdict or notice of the entry of judgment of the court or master, or such further time as the court or judge may grant, a memorandum of the items of his costs and

Appellant's argument that in any event the same items should have been recoverable as contractual costs fails for the same reason that its claim for attorney fees fails. The costs referred to in the Limited Guaranty[11] are costs of collection on the original note. Here the Limited Guaranty does not contain an express provision for the payment of costs in connection with its enforcement. The district court did not err in disallowing costs to the appellant.

The orders of the district court are affirmed.

THOMPSON, C. J., and GUNDERSON and ZENOFF, JJ., and GUINAN, D. J., concur.

---

necessary disbursements in the action or proceeding, which memorandum must be verified by the oath of the party, or his attorney or agent, or by the clerk of his attorney, stating that to the best of his knowledge and belief the items are correct, and that the disbursements have been necessarily incurred in the action or proceeding."

[11]See footnote 7, supra.